McGRAW–EDISON COMPANY,
Plaintiff-Appellant,

v.

WALT DISNEY PRODUCTIONS and
Bally Manufacturing Corporation,
Defendants-Appellees.

No. 85–1255.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1985.

Decided April 4, 1986.

Charles A. Laff, Laff, Whitesel, Conte & Saret, Chicago, Ill., for plaintiff-appellant.

David Goldberg, Cowan, Liebowitz & Latman, New York City, for defendants-appellees.

Before WOOD and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

Plaintiff-appellant, McGraw-Edison Company ("McGraw-Edison"), brought this action against the defendants-appellees, Walt Disney Productions ("Disney") and Bally Manufacturing Corporation ("Bally"), alleging that the defendants' use of the plaintiff's TRON trademark violates sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114(1)[1] and 1125(a),[2] the Illinois Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22,[3] the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, §§ 311–317,[4] and the common law of the State of Illinois. The district court granted summary judgment in favor of Disney and Bally, and McGraw-Edison appeals. We reverse.

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. Section 32(1) of the Lanham Act provides: "Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided...."

15 U.S.C. § 1114(1).

2. Section 43 of the Lanham Act provides:

(a) Any person who shall affix, apply or annex, or use in connection with any goods or services, or any container or containers of goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

15 U.S.C. § 1125(a).

3. The Illinois Anti-Dilution Act provides in pertinent part:

"Every person ... adopting and using a mark [or] trade name, ... may proceed by suit, and the circuit courts shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark [or] trade name ... if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark [or] trade name of the prior user notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services."

Ill.Rev.Stat. ch. 140, § 22.

4. The Illinois Deceptive Trade Practices Act defines as deceptive conduct which:

"(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with or certification by another;"

Ill.Rev.Stat. ch. 121½, § 312.

## I

Since 1900 McGraw-Edison has engaged in the manufacture, distribution, and sales of electrical and mechanical products and related services for both consumer and commercial applications. The Bussmann division of McGraw-Edison manufacturers, distributes, and sells fuses and fuse accessories, and is the world's largest manufacturer of small and medium dimension fuses. McGraw-Edison registered its trademark TRON in 1958 (for electrical fuses) and 1968 (for fuse holders, clip clamps and fuse clips) and has used the trademark TRON to identify a line of fuses and fuse accessories, placing the TRON mark on both the product and its packaging. The defendants do not dispute that McGraw-Edison's registrations for the trademark TRON are in full force and effect and are the only registrations for the mark TRON on the U.S. Trademark Register.

Between 1970 and 1983, McGraw-Edison sold more than $85 million worth of TRON fuse products and spent more than $1.5 million in advertising TRON products. TRON fuse products are sold in a variety of outlets, including drug stores, grocery stores, discount stores (e.g., Target, K-Mart, Venture, Woolco-Woolworths), hardware stores (e.g., Ace Hardware, True Value Hardware), and electrical supply and catalog houses (e.g., Advent, Newark). TRON products are advertised in magazines, trade directories, catalogs and through point of sale materials.

Walt Disney Productions is in the entertainment industry, notably the production of motion pictures, television programs and the operation of amusement parks. In June 1980, Disney purchased a screenplay entitled TRON, and developed a motion picture with the same name.[5] In early 1981 Disney began to develop a merchandising program "to attract prospective manufacturers to produce and sell merchandise associated with the 'TRON' motion picture." At the same time that Disney was developing the merchandise licensing program, it engaged TCR Service, Inc. to conduct a trademark search in order that Disney might determine whether the use of the name TRON would conflict with third party uses of similar names on like goods. Disney discovered that the Mego Toy Company ("Mego") owned a federal trademark registration for the mark TRONS for futuristic toys, dolls, and toy robots, as well as federal registrations for variations of the term TRON—such as BIOTRON, MICROTRON, ALPHATRON, and BETATRON,— also for use on futuristic toys, dolls, and robots. Disney negotiated with Mego and acquired Mego's registrations and rights in the mark TRONS and the variations of TRON (BIOTRON, MICROTRON, etc.) owned by Mego. Disney's trademark search also disclosed McGraw-Edison's registration for the trademark TRON covering electric fuses and accessories, but Disney's senior legal counsel did not consider McGraw-Edison's registrations as a bar to Disney's use of the mark TRON.

As a result of its licensing and merchandising program, Disney entered licensing agreements with manufacturers for a wide variety of products displaying the TRON mark for sale throughout the country. Specifically, Disney licensed the mark TRON to the defendant Bally for video games and software and to other manufacturers for items such as telephones, phonograph records, wristwatches, tee shirts and sweatshirts, posters, paperback books, nightgowns, pajamas and robes, masquerade costumes, caps, sheets, pillow cases, comforters, bed spreads, curtains, coordinated active wear, warm-up suits, infant and toddler knit shirts and sleepwear, jewelry, buttons and pins, sleeping bags, wal-

---

5. According to Disney:

"The plot of the movie involved a real world in which people are controlled by an evil conglomerate using a master computer program, and an electronic world inside the computer program. The hero of the film is transported into the computer program where he wages a battle against evil in a setting filled with sights and sounds typical of a video game. The characters in the electronic world are counterparts to characters in the real world. Among these characters is a video warrior named 'TRON.'"

lets and bags, beach towels, board games, sun glasses, books, toy figures, View Master slides, puzzles, soaps, thermal mugs and tumblers. From the inception of its merchandising program in 1981 through April 2, 1983, the TRON products licensed by Disney generated $58 million in sales, with more that $52 million of that total attributable to electronic products, such as computer video games and software.

In June 1982, prior to the scheduled July release of the motion picture TRON, McGraw-Edison contacted Disney and Bally (licensed by Disney to manufacture a video game entitled "TRON") and asserted its rights in its registered trademark TRON. After negotiations failed to resolve the dispute between McGraw-Edison and Disney and Bally, Disney brought a declaratory judgment action in the United States District Court for the Southern District of New York; on the same day, McGraw-Edison filed its complaint in the present action against Disney and Bally.[6] Count I of McGraw-Edison's complaint alleged that Disney's and Bally's use of the TRON mark is likely to cause confusion, or mistake, or to deceive consumers as to the origin and sponsorship of the products of McGraw-Edison, Disney and Bally in violation of the Lanham Act. 15 U.S.C. § 1114(1), § 1125(a). Count II claimed that the defendants' use of McGraw-Edison's TRON trademark constituted unfair competition, caused injury to McGraw-Edison's business reputation and good will and diluted the distinctive character and quality of McGraw-Edison's TRON mark in violation of Ill.Rev.Stat. ch. 140, § 22, ch. 121½, §§ 311–17, and Illinois common law. McGraw-Edison sought to enjoin Disney and Bally from further use of the TRON mark, requested an accounting of all profits the defendants derived from their use of the mark TRON, and prayed for compensatory as well as punitive damages.

The defendants filed a motion for summary judgment, arguing that the undisput-

ed facts demonstrated "that the continued respective uses by the parties of the name 'TRON' cannot result in confusion. Nor is it likely that [the] defendant's continued use of the name 'TRON' will diminish the value of plaintiff's trademark used in connection with the sale and promotion of its fuse products." The district court granted summary judgment in favor of the defendants on both counts of the complaint, and rejected McGraw-Edison's claim that the existence of material issues of fact precluded summary judgment stating, "those issues [presented by McGraw-Edison] are either not material or are legally based."

In determining whether the defendants had created a likelihood of confusion as to the origin of its products, as required to prove a violation of 15 U.S.C. §§ 1114, 1125, the district court considered the seven factors delineated by this court in *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325 (7th Cir. 1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978): (1) similarity of the marks; (2) similarity of the product; (3) area and manner of concurrent advertising and use; (4) degree of care likely to be exercised by consumer; (5) strength of plaintiff's mark; (6) actual confusion; and (7) intent of the infringer to palm off its products as those of another. *Id.* at 1330. The district court concluded:

"In light of the lack of evidence of actual confusion on the part of consumers, the lack of concurrence of markets and advertising, the difference in printing of the two marks, and the lack of intent on the part of defendants to pawn off their products as plaintiff's the court finds that no likelihood of confusion exists."

With respect to McGraw-Edison's state law claims in Count II, the court noted that the Illinois Deceptive Trade Practices Act, Ill. Rev.Stat. ch. 121½, § 312, imposes liability upon an infringer only if a likelihood of confusion exists. The court concluded that the defendants were not liable under the

---

**6.** Disney subsequently dismissed its declaratory judgment action against McGraw-Edison in the

United States District Court in New York.

statute, referring to its previous conclusion that no likelihood of confusion existed. The district court also granted summary judgment with respect to the plaintiff's claim under the Illinois Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22, on the basis of its finding that McGraw-Edison's mark TRON was not distinctive. On appeal, McGraw-Edison claims that there are genuine issues of material fact which preclude summary judgment on the issue of likelihood of confusion, and. that the district court committed errors of law in dismissing its dilution claim.

## II

In reviewing the district court's grant of summary judgment, "we note that judgment is appropriate when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir., 1985) (quoting Fed.R.Civ.P. 56(c)); *see also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "The party moving for summary judgment has the burden of establishing the lack of a genuine issue of material fact." *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). Thus, "in determining whether factual issues exist, a reviewing court must view all the evidence in the light most favorable to the non-moving party." *Black*, at 1278 (quoting *Collins v. American Optometric Association*, 693 F.2d 636, 639 (7th Cir.1982)); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Where the moving party fails to meet its strict burden of proof, summary judgment cannot be entered...." *Big O*, 741 F.2d at 163. "[E]ven though there may be no dispute about the basic facts, still summary judgment will be inappropriate, if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts." *Central National Life Insurance v. F & D Co. of Maryland*, 626 F.2d 537, 539 (7th Cir.1980). "[T]he responsibility of the district judge on a motion for summary judgment is merely to determine whether there are issues to be tried, rather than to try the issues himself via affidavits." *American International Group, Inc. v. London American International Corporation Ltd.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir.1975)). We must also bear in mind in this trademark action that "[o]ne who adopts a mark similar to another already established in the marketplace does so at his peril.... All doubts must be resolved against him." *Beer Nuts, Inc. v. Clover Club Foods, Co.*, 711 F.2d 934, 941 (10th Cir.1983).

### A. Count I

McGraw-Edison has asserted claims against Disney and Bally under sections 32 and 43 of the Lanham Act of 1946, 15 U.S.C. §§ 1114, 1125; both sections require that a plaintiff demonstrate that the defendant has created a likelihood of confusion as to the origin of his product. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 115 (2d Cir.1984) (§ 1125); *Helene Curtis*, 560 F.2d 1325, 1330 (§ 1114); *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 381 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) (§ 1114). "Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties. A variety of factors may be material in assessing the likelihood of confusion." *American International Group*, 664 F.2d at 351. *See also Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 354 (7th Cir.1983); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 273 (7th Cir.1976). In determining likelihood of confusion, this circuit has considered several factors to be important:

> "the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the

strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another."

*Helene Curtis*, 560 F.2d at 1330 (quoting *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 705 (2d Cir.1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971)); *see also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 934 (7th Cir.1984). "None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214, 218 (5th Cir.1985). In fact, this court has reversed lower court decisions that have placed excessive importance on certain factors. *Piper Aircraft*, 741 F.2d at 934. McGraw-Edison contends that a factual dispute existed for each of these factors except one (the strength of plaintiff's mark, which McGraw-Edison maintains the district court nevertheless resolved in defendants' favor on the basis of improper and inadmissible evidence), and that the district court improperly resolved factual disputes in defendants' favor on all of the remaining issues except the similarity of the marks. We will consider each of the factors enumerated in *Helene Curtis* in turn.

1. The Degree of Similarity Between the Marks

██ The district court acknowledged differences between the plaintiff's and defendants' presentation of the mark TRON:

"The word TRON as presented by plaintiff, is spelled in straight block letters in one color. In addition, wherever the word TRON appears in plaintiff's packaging or product, the term Buss or Bussmann also appears, indicating production by plaintiff's Bussmann division. Sometimes the mark BUSS is as prominent as the mark TRON ....

The mark TRON, as presented by defendants, is spelled with somewhat unique futuristic-type lettering, with darker colors usually above lighter colors in the letters.... In some of the packaging or advertisements for products tied into the movie, the word 'tron' is spelled in block letters, as plaintiff contends. ... In each case, however, the corresponding product itself has the uniquely patterned letters.... In addition, in each instance where the word 'tron' appears, Walt Disney's name also appears, though in very tiny letters."

Despite these differences in presentation, the court concluded that "there is a high degree of similarity between the marks and, though their presentation is different, the possibility of confusion exists based upon the marks alone." Nevertheless, the district court cited "the difference in printing of the two marks" in support of its ultimate conclusion that there was no likelihood of confusion between the plaintiff's and the defendants' products. McGraw-Edison contends that some of the Disney licensed products fail to include any mention of Disney and that some of the products do not incorporate the described color scheme. McGraw-Edison further claims that Disney considers the use of TRON in block letters to be within the scope of its (Disney's) rights. In view of these contentions (the failure to include Disney's name on all Disney licensed TRON products and the failure to employ the described color scheme on all of Disney's TRON items), McGraw-Edison argues that the district court improperly distinguished the parties' marks on the basis of Disney's futuristic lettering style and the inclusion of Walt Disney's name on any Disney TRON product. Were we to accept McGraw-Edison's view of the facts regarding Disney's use of the TRON mark (failing to place Disney's name on all Disney licensed TRON products or incorporate the Disney color scheme on all Disney TRON merchandise), the fact remains that the marks are distinguishable since wherever the word TRON appears on McGraw-Edison's packaging or products, the term Buss or Bussmann also appears (Disney licensed products obviously do not include the term Buss or Bussmann). The marks thus are not identical,

and the district court could properly conclude that "there is a high degree of similarity between the marks," yet consider the differences between the marks in determining whether a likelihood of confusion existed between McGraw-Edison's and defendants' products.

### 2. The Similarity of the Products

■ According to the district court, "The product lines carrying Disney's TRON label and plaintiff's TRON label are very different.... Plaintiff's TRON line ... includes high quality, utilitarian electrical products. The products carrying Disney's TRON label are entertainment-based. Video games, pajamas, toy watches, T-shirts and costumes have little to do with high quality fuses." The court concluded that the McGraw-Edison and Disney product lines are "entirely unrelated." McGraw-Edison contends the district court failed to recognize the wide scope of Disney's licensing program and emphasis on electrical and electronic products and overlooked the fact that McGraw-Edison fuses are compatible and consistent with the type of products licensed by Disney. The defendants argue, without providing any statutory or case law support, "the only material issue in determining similarity of the products is whether any of the goods actually licensed by Disney are in any way related to fuses."

The fact that the products at issue may be "very different" is not dispositive of the issue of the similarity of the products in determining the existence of a likelihood of confusion between products. The question is "whether the products are the kind the public attributes to a single source." *E. Remy Martin & Co., S.A. v. Shaw-Ross International Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir.1985). "[T]he rights of an owner of a registered trademark ... extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods." *Id.; see also Sign of the Beefeater*, 540 F.2d at 274. In finding the parties' product lines to be "entirely unrelated," the district court apparently ignored the question of whether the purchasing public might believe a single source could produce both electronic fuses (manufactured by McGraw-Edison) and video games and telephones (licensed by Disney); ignoring this question seems especially significant in this case since McGraw-Edison introduced evidence that 35% of persons shown photographs of both McGraw-Edison and Disney TRON products believed the products were manufactured by the same company. (McGraw-Edison's survey is discussed *infra*.) Further, the district court's opinion failed to address the fact that the defendant Bally has been a customer of McGraw-Edison and uses McGraw-Edison fuses in at least some of its video arcade games—a fact which conceivably could lead a consumer to believe that TRON fuses and TRON video games are in some manner attributable to a single source. Accordingly, we hold that a genuine issue of material fact exists regarding "whether the products are the kind the public attributes to a single source," and the district court erred in finding the product lines of the parties to be "entirely unrelated."

### 3. The Area and Manner of Concurrent Use

■ The district court found "the TRON products licensed by Disney are generally sold to those who have seen or are interested in the movie ... [while] plaintiff's products are generally sold to industrial users (30% to 40%) and electronic experts (40% to 50%)." The court further stated:

"Of the 10 to 20 percent purchased by the public, the fuses are sold in electrical stores or electrical departments of general stores. Only 10 per cent of plaintiff's advertising is directed to the lay consumer. Though some stores may carry both plaintiff's goods and Disney's licensed goods, the intersection is small. ... Generally, public purchasers of plaintiff's goods will purchase them in electrical outlet stores where goods licensed by defendant Disney with the TRON mark will usually not be available."

Our review of the record has failed to disclose any evidence supporting the

court's initial finding that Disney's TRON products "are generally sold to those who have seen or are interested in the movie ...." Further, the district court found that "only 10 percent of plaintiff's advertising is directed to the lay consumer," while the record reveals that in addition to the approximately ten percent of the TRON advertising funds expended directly in the residential consumer market, McGraw-Edison provided an undisclosed amount of advertising materials to its distributors who in turn advertised to residential customers. Thus the total amount of advertising directed to residential consumers cannot be established on the basis of the record before the court. Finally, the record reflects that Disney does not limit the type of retail outlets where its licensed products are sold, (except to exclude outlets that are incompatible with the Disney image such as barrooms or poolrooms or dance halls) but rather Disney allows its products to be sold in hardware stores, through mail order and catalog sales, and in department stores such as K-Mart, Sears, Montgomery Ward, and Woolco-Woolworths. The record also discloses that McGraw-Edison TRON fuses are sold in drug stores, grocery stores, hardware stores and department stores such as Target, K-Mart, Venture and Woolco-Woolworths. But we have been unable to discover any evidence in the record documenting the percentage of TRON fuses sold to the general public through hardware or department stores as opposed to electronic specialty stores, nor have we found evidence in the record demonstrating the percentage of Disney licensed TRON products sold in hardware and department stores as opposed to mail order or catalog outlets, or other retail outlets where McGraw-Edison TRON products are not available. Thus, on the record we are unable to find support for the district court's conclusion that McGraw-Edison and Disney TRON products are not sold in similar outlets. Since the defendants have failed to provide evidence establishing who purchases Disney TRON products, the extent of McGraw-Edison TRON advertising directed to residential consumers, and the number of stores carrying both Disney TRON products and McGraw-Edison TRON fuses, we hold that the defendants have failed to meet their burden of proving the lack of a genuine issue of material fact concerning the area and manner of concurrent use of the plaintiff's and defendants' products.

4. The Degree of Care Likely to Be Exercised by Consumers

■ The district court compared the types of products manufactured by McGraw-Edison and licensed by Disney and concluded, "Generally, consumers buying fuses would take more care than those buying the products licensed by Disney." As our review of the record has failed to reveal evidence supporting this conclusion of the district court, we hold that the defendants have failed to establish the lack of a genuine issue of material fact with respect to the degree of care likely to be exercised by consumers.

5. The Strength of McGraw-Edison's Mark

■ It is undisputed that McGraw-Edison's registration of TRON is the only registration for that trademark. The court noted, however, the existence of numerous registrations for trademarks similar to TRON, for example, TRONS, CELTRON, Z–TRON, U V TRON, FILTRON, TRINI-TRON, ACUTRON, TICKETRON, and VOLTRON. The court also noted that McGraw-Edison's trademark TRON is always accompanied by Buss or Bussmann, and that the majority of TRON advertising has been geared toward a narrow, sophisticated audience through trade journals. According to the court, "These factors indicate that TRON is a relatively weak mark outside its narrow area of high quality fuse products."

In assessing the strength of the McGraw-Edison TRON mark, we initially must determine which category of trademarks the word TRON belongs to:

"Trademarks may be placed into four categories according to strength and the corresponding amount of protection

which will be accorded them. Trademarks can be (1) descriptive or generic, i.e., the mark describes the product or service itself; (2) suggestive, i.e., the mark describes or suggests a characteristic of the product or service; (3) arbitrary, i.e., the mark is a word in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service; and (4) coined, i.e., the mark is a word devised or invented for the purpose of identifying the product."

*Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 n. 2 (7th Cir.1965); *see also Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan,* 651 F.2d 311, 315 (5th Cir.1981). One commentator has referred to coined marks as "fanciful": " 'Fanciful' marks consist of 'coined' words which have been invented for the sole purpose of functioning as a trademark. Such marks comprise words which are either totally unknown in the language or are completely out of use at the time, as with obsolete or scientific terms." McCarthy, Trademarks and Unfair Competition, § 11:3, 436 (2nd Ed.1984). We believe that the district court properly characterized the mark TRON as "somewhat fanciful" as the presentation of evidence in the record fails to disclose the origin of the TRON mark or whether TRON has any meaning as a word,[7] *cf. J.B. Williams Co., Inc. v. Le Conte Cosmetics, Inc.,* 523 F.2d 187, 192 (9th Cir.1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976) ("Conti" considered to be a strong mark because the origin of the name was unknown and there was no evidence that it was a word with meaning of its own), but we are unable to ascertain from the record whether the district court considered the fanciful nature of the TRON mark in finding TRON to be "a relatively weak mark outside its narrow area of high quality fuse products."

Furthermore, the third party registrations of trademarks similar to TRON discussed by the district court are material in determining the strength of the TRON mark only to the extent that the similar marks are promoted by their owners or recognized by the consuming public. "A trademark which is found only in the records of the Patent and Trademark Office does not materially affect the distinctiveness of another's mark which is actively used in trade." Callmann, Unfair Comp., Trademarks & Monopolies § 20.44, 270 (4th Ed.1983).

"The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers. As the Court pointed out in *Lilly Pulitzer, Inc. v. Lilli Ann Corp.,* 376 F.2d 324, 325 (1967), 'the existence of these registrations is not evidence of what happens in the marketplace or that customers are familiar with their use.' "

*Scarves by Vera, Inc. v. Todo Imports Ltd., Inc.,* 544 F.2d 1167, 1173 (2d Cir. 1976); *see also Stanadyne, Inc. v. Lins,* 490 F.2d 1396, 1397 (CCPA 1974); *Smith Bros. Mfg. Co. v. Stone Mfg. Co.,* 476 F.2d 1004, 1005 (CCPA 1973). Also, since the record before us fails to contain any evidence that these "similar trademarks" are actually used by third parties or that they have been promoted and are recognized by consumers, we conclude the defendants have failed to prove the absence of a genuine issue of material fact regarding the strength of the TRON mark.

6. Actual Confusion

■ Our review of the record reveals that the defendants have failed to provide any evidence to show that there was no likelihood of confusion between its TRON products and McGraw-Edison TRON prod-

---

**7.** Although the district court concluded that the word "tron" is taken from the word electronic, we have found no evidence in the record to support this hypothesis or speculation which might actually be accurate, but a look into Webster's Third New International Dictionary (unabridged) discloses that tron is a suffix denoting a vacuum tube or denoting a device for the manipulation of subatomic particles.

ucts. McGraw-Edison commissioned Elrich and Lavidge, Inc., a marketing research firm, to conduct a marketing research study to determine whether there existed a likelihood of confusion between the plaintiff's and the defendants' TRON products. The survey consisted of 494 personal interviews conducted in five cities. The people interviewed were shown a photograph of McGraw-Edison's TRON electric fuses along with a photograph of one of Disney's licensed products bearing the TRON name. When asked whether the products were put out by the same company or a different company, 175 out of 494 people interviewed (35%) replied that it was the same company.[8] McGraw-Edison submitted the survey to the court as evidence of actual confusion between McGraw-Edison's and Disney's products bearing the TRON mark. The district court discounted this survey, stating that it had:

"problems similar to a survey discussed in *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356–57 (7th Cir.1983). In *Henri's*, the questions tended to bring to the interviewee's mind the products which contained the allegedly infringed mark. The interviewee was then asked who made the infringing product. The court held that the previous questions had potentially contaminated the latter question."

The plaintiff in *Henri's* commissioned two separate and distinct surveys to be conducted, neither of which employed the same methodology as the survey in the present case: while the survey in the case at bar presented photos of both Disney's and McGraw-Edison's TRON products to the interviewees and asked whether the goods were "put out by the same or different companies", both surveys discussed in *Henri's* presented the interviewee with a single product and asked either "Who do you believe makes this product?" or "Who puts out this product?" In one of the *Henri's* surveys, the question of "Who puts out this product?" was preceded by

five other questions that potentially contaminated the responses to the final question concerning the origin of the product. The district court's comparison and application of that survey to the survey in this case is both inappropriate and misapplied as they used a completely different methodology in comparison with the present survey. We thus disagree with the district court that the survey introduced by McGraw-Edison suffered from the same problems as the survey in *Henri's*. Furthermore, the *Henri's* court acknowledged that the defendant pointed to several flaws in one of the surveys "which caution against giving it too much weight," but the court also stated, "we cannot conclude, however, that the survey should be ignored." *Henri's*, 717 F.2d at 357. We see no logical or legally sound reason nor has the district court given any persuasive reasoning or explanation of why the survey results are not probative as to confusion among the consuming public. Although the district court suggested that a flaw of the survey was its presentation of both Disney and McGraw-Edison products to a single interviewee instead of giving each interviewee either a McGraw-Edison product or a Disney product and inquiring who put out the product, we believe the district court's concern regarding the manner of presentation to the interviewee goes to the weight to be accorded to the survey results rather than providing a reason to ignore the survey evidence altogether. We thus conclude the district court improperly disregarded the results of McGraw-Edison's survey showing that 35% of those interviewed believed the McGraw-Edison and Disney products shown to them were put out by the same company.

"[R]eason tells us that ... very little proof of actual confusion would be necessary to prove likelihood of confusion." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971). Indeed, while likelihood of confu-

---

**8.** One-half of those interviewed were asked, "Are these two products put out by the same company or by different companies?"; and one-half were asked the question in the reverse order, "Are these two products put out by different companies or by the same company?"

sion "can be proven without any evidence of actual confusion, such evidence if available, is entitled to substantial weight." *Helene Curtis,* 560 F.2d at 1330. Since the defendants have failed to offer any evidence to demonstrate that there is no likelihood of confusion and, on the other hand, the plaintiff has offered its survey results revealing that 35% of those individuals interviewed were confused as to whether the McGraw-Edison and Disney TRON products shown to them were manufactured by the same company, we conclude the defendants have not established the lack of a material question of fact regarding actual confusion.

### 7. The Intent on the Part of the Alleged Infringer

■ The district court noted that Disney and Bally were aware of McGraw-Edison's TRON trademark when they licensed products bearing that mark, but found no evidence that Disney intended to confuse consumers: "In fact, the evidence clearly shows that Disney believed it was not infringing upon plaintiff's mark. Intent, therefore does not come into play in the court's calculations." McGraw-Edison argues to the contrary that Disney disregarded McGraw-Edison's rights, since its efforts in licensing and marketing TRON products "increased the likelihood that a consumer would be confused into believing there was a common sponsorship or authorization between the parties or their products, and increased the dilution of plaintiff's mark." The record reveals that Disney knew of McGraw-Edison's registration of the mark TRON and McGraw-Edison's use of that mark, went to their own retained counsel to support their theory that McGraw-Edison's registrations of the TRON mark did not bar Disney's use of TRON, and proceeded with licensing and merchandising its own line of TRON products without even contacting McGraw-Edison. "Subjective issues such as good faith

are singularly inappropriate for determination on summary judgment." *American International Group, Inc. v. London American International Corporation Ltd.,* 664 F.2d 348, 353 (2d Cir.1981); *see also Central National Life Insurance v. F & D Co. of Maryland,* 626 F.2d 537, 540 n. 6 (7th Cir.1980) ("Where intent is a controlling element, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses ....."). In view of the fact that Disney proceeded to license TRON products despite its awareness of McGraw-Edison's registered TRON trademark, we conclude that the district court improperly resolved the issue of the defendants' intent against McGraw-Edison on the motion for summary judgment.

Since we are convinced that the defendants have failed to meet their strict burden of proof in establishing the lack of genuine issues of material fact with respect to: 1) whether the products bearing the McGraw-Edison TRON mark and the products bearing the Disney TRON mark are the kind the public attributes to a single source; 2) the area and manner of concurrent use of the products; 3) the degree of care likely to be exercised by consumers purchasing McGraw-Edison's and Disney's TRON products; 4) the strength of McGraw-Edison's TRON mark; 5) the extent of actual confusion among consumers; and 6) the intent of Disney, we hold that the district court erred in concluding as a matter of law that no likelihood of confusion exists and in granting summary judgment in favor of the defendants on Count I.

### B. Count II

■ In Count II, McGraw-Edison asserted claims under Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, § 312, and the Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22.[9] Under the Illinois Deceptive

---

**9.** McGraw-Edison also claimed that the defendants had engaged in unfair competition in violation of Illinois common law. We need not address this claim separately as the Illinois De-

ceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, § 311 *et seq.* is merely a codification of the Illinois common law of unfair competition.

Trade Practices Act a defendant is liable only if the plaintiff can establish a likelihood of confusion between the parties' products. *Hooker v. Columbia Pictures Industries, Inc.*, 551 F.Supp. 1060, 1064 (N.D.Ill.1982). " 'Likelihood of confusion' has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in traditional infringement cases." *Id.* As we have found that a genuine issue of material fact exists regarding the likelihood of confusion between defendants' and plaintiff's products bearing the TRON mark, we conclude that the granting of summary judgment was unwarranted and improper on McGraw-Edison's claim under the Illinois Deceptive Trade Practices Act.

Under the Anti-Dilution Act, the relevant factors to be considered by the court are "the distinctiveness of the mark and whether the mark is being diluted." *Hyatt Corporation v. Hyatt Legal Services*, 736 F.2d 1153, 1157 (7th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984). The district court reiterated its finding that McGraw-Edison's mark TRON was "a weak mark," noting that many products have names similar to or incorporating the TRON name and that the TRON name is almost always used in connection with Bussmann or Buss. Further the court noted that the word TRON "is not extraordinarily unique, taken as it is from the word 'electronic.' " Finding the plaintiff's mark not to be distinctive, the court failed to analyze whether the defendants' use of the TRON mark diluted the strength of McGraw-Edison's mark. McGraw-Edison argues to the contrary that its mark TRON is distinctive, emphasizing: 1) that its mark TRON has been registered since 1958 and is the only trademark registration with that name; 2) that it has spent over $1.5 million in advertising TRON products since 1970; 3) that the district court found the word TRON to be "somewhat fanciful and create[ ] images of high level electronics"; 4) that it has sold over $85 million of TRON products since 1970; and 5) that its Buss-

mann division which markets TRON products, "is the world's largest manufacturer of small and medium dimension fuses." In *Hyatt*, we stated that the factors to be considered in determining the distinctiveness of a mark include the type of mark (a mark that is "coined" or invented may make distinctiveness easier to show), the length of time of the mark has been used, the scope of advertising and promotions, the nature and extent of the business and the scope of the first user's reputation. 736 F.2d at 1158. We have already concluded above that the defendants have failed to prove the absence of genuine issues of material fact with respect to the strength of McGraw-Edison's TRON mark (specifically regarding the use of "similar" trademarks registered by third parties) and the scope of McGraw-Edison's advertising and promotion of TRON products to residential consumers. Accordingly, we hold that the existence of these factual issues precludes the court from finding that McGraw-Edison's TRON mark is not distinctive as a matter of law, and we hold that it was error for the district court to grant summary judgment on the state law claims asserted in Count II of McGraw-Edison's complaint.

In reversing the district court's grant of summary judgment, we express no view as to the merits of McGraw-Edison's claims. Rather, we only conclude that on the present record, the district court should not have decided the disputed issues in the case on a motion for summary judgment.

### III

The judgment of the district court is REVERSED.