MIL–MAR SHOE CO., INC., d/b/a
Warehouse Shoes, Plaintiff,

v.

SHONAC CORPORATION, Defendant.

No. 95–C–852.

United States District Court,
E.D. Wisconsin.

Oct. 5, 1995.

Michael Ash, Godfrey & Kahn, S.C., Milwaukee, Wisconsin, for Plaintiff.

Dyann Bumpke, Michael, Best & Friedrich, Milwaukee, Wisconsin, for Defendant.

## DECISION and ORDER

GOODSTEIN, United States Magistrate Judge.

On July 28, 1995, the plaintiff brought this action in Milwaukee County Circuit Court against the defendant, alleging common law trade name infringement, a state law claim for trademark infringement and unfair competition. Also on that date, the plaintiff filed a motion for a temporary restraining order and temporary injunction, the former of which was then granted pending a hearing on the temporary injunction motion. This case was then removed to the United States District Court, Eastern District of Wisconsin on August 14, 1995. This case was randomly assigned to this court for all pretrial processing. Subject matter jurisdiction is proper based upon diversity of citizenship and an amount in controversy over $50,000. 28 U.S.C. § 1332(a)(1). Venue is proper in the Eastern District of Wisconsin.

The preliminary injunction motion was fully briefed, including an opportunity by plaintiff to supplement its motion, and on September 28, 1995, the court conducted a hearing on the motion. The parties have consented to the exercise of magistrate judge jurisdiction for the limited purpose of resolving the preliminary injunction motion and therefore the court has jurisdiction to issue the following order. 28 U.S.C. § 636(c).

Briefly, by way of background, Defendant Shonac Corporation (hereinafter "Shonac"), an Ohio corporation, has announced that it intends to open a retail shoe store in Wauwatosa, Wisconsin to be called "DSW Shoe Warehouse." Plaintiff Mil–Mar Shoe Co., Inc. (hereinafter "Mil–Mar"), a Wisconsin corporation, which does business as "Warehouse Shoes," moves for a preliminary injunction to prevent the use of that name, the name "Shoe Warehouse," or any other name confusingly similar to "Warehouse Shoes" in connection with retail shoe stores in the Greater Milwaukee area.

To obtain a temporary injunction, the movant must prove 1) the likelihood of success on the merits and 2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant clears the first two thresholds, the court weighs 3) the relative harms to the parties and 4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994) (citing *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992)). "If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir.1993). The court will initially address the various issues raised by the parties under the first prong of the threshold determination, a reasonable likelihood of success.

## I. Likelihood of Prevailing on the Merits

Mil–Mar brings three claims: 1) a claim for common law infringement of a

trade name; 2) a state claim for trademark infringement pursuant to Wis.Stats. § 132.033; and 3) a claim for unfair competition. With respect to the claim for unfair competition, Mil–Mar has presented no evidence that Shonac is intending to mislead or deceive the public into believing that Shonac is part of, or associated with Warehouse Shoes and therefore, at this juncture, Mil–Mar has shown no reasonable likelihood of prevailing on the merits of this claim. As to the claim under state law for violation of Mil–Mar's state-registered trademark, as conceded by plaintiff's counsel at the hearing, the registration of a trade name or mark with the Wisconsin Secretary of State does not in and of itself confer rights to the plaintiff. As such, the analysis for state and common law trademark infringement claims is identical.

## A. Protection as a Trade Name or Trade Mark

■ The court must begin by determining whether the name "Warehouse Shoes" is capable of protection as a trade name or trade mark. Marks are classified in categories of generally increasing distinctiveness and the degree of protection afforded to them: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; or 5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). A "generic" term is one that refers to the genus of which the particular product is a species and cannot become a trademark under any circumstances. *Henri's Food Products Co. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306 (7th Cir.1987). "Descriptive" terms describe the "intended purpose, function or use of the goods, the size of the goods, the class of users of the goods, a desirable characteristic of the goods or the end effect upon the user." 1 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 11.05[2][a] (3rd Ed.1995). A descriptive term may also be a protected trademark if it has taken on a "secondary meaning" such that customers identify the name with a particular business identity and distinguish it from others. *See First Wisconsin Nat'l Bank v. Wichman*, 85 Wis.2d 54, 60, 270

N.W.2d 168 (1978); *Spheeris Sporting Goods, Inc. v. Spheeris on Capitol*, 157 Wis.2d 298, 312, 459 N.W.2d 581 (1990). "Suggestive" terms suggest an ingredient or characteristic of a good and can be protected without proof of a secondary meaning. *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Similarly, arbitrary or fanciful terms enjoy the same protection as suggestive terms. *Id.*

■ Although Mil–Mar uses the word "suggestive" when characterizing the term "Warehouse Shoes," "Warehouse Shoes" does not require the observer to use imagination and perception to determine the nature of the goods and therefore Mil–Mar has not persuaded the court that it is a "suggestive" term within the context of trademark law. *See Miller Brewing Co.*, 561 F.2d at 79. Likewise, it is obvious that "Warehouse Shoes" is neither "arbitrary" or "fanciful," as those terms are used in trademark law.

■ Shonac argues that "Warehouse Shoes" is a generic term and thus is not capable of protection as a trademark under any circumstances. In support, Shonac cites to *Warehouse Foods, Inc. v. The Great Atlantic and Pacific Tea Co.*, 223 U.S.P.Q. 892, 893 (N.D.Fla.1984), in which the court held that the name "Warehouse Foods" was generic and rejected the theory that the combination of those words created a descriptive trademark capable of becoming a valid trademark upon proof of secondary meaning. Shonac also cites to *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 81 (7th Cir.1977), where the court held that the term "light" is a generic term when used with "beer" such that it could not be exclusively appropriated by Miller as a trademark despite promotional efforts expended to exploit it. Because "Warehouse Shoes" is not federally registered, the burden is on Mil–Mar to prove that the mark is a valid trademark. *Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) (citing *Reese Publishing v. Hampton Int'l Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.1980)).

Placement in a category is a question of fact. Evidence considered by the courts in determining whether a particular term is generic include the competitor's use of the term, plaintiff's use of the term, dictionary definitions and media usage. 2 McCarthy, *supra*, § 12.07[7][b]; *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 905–06 (7th Cir. 1983). Although a court may examine the meaning of two component words in determining the meaning of the mark as a whole, the Seventh Circuit has noted that dissecting marks often leads to error. *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366, 379 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). "Words which could not initially become a trademark may become one when taken together." *Id.* The court must therefore view the term "warehouse" together with "shoes" to see if the words taken together are subject to trademark protection.

Shonac asserts that the evidence establishes that "warehouse shoes" and "shoe warehouse" are generic. Shonac reports that competitors frequently use the term warehouse: nationwide, 20,000 stores use "warehouse," 8,000 of which are retail stores, and that there are hundreds of retail stores which use "warehouse shoes" or "shoe warehouse" in their names. Shonac's Brief in Opposition at Exhibit C. Shonac argues that Mil–Mar defines "warehouse" as a large, retail store that inventories hundreds of pairs of shoes. In reaching this conclusion, Shonac relies upon the deposition of Ron Stephens, an employee of Warehouse Shoes in the area of advertising and marketing since 1970, who agreed with this definition when asked at his deposition the meaning of the word "warehouse." Stephens Dep., p. 26 lines 24–25, p. 27, lines 1–2. As to dictionary definitions, Shonac asserts that "warehouse" is defined as a wholesale or large retail store. Lastly, Shonac introduced articles in Exhibit A to its Brief in Opposition as evidence that the media uses the word "warehouse" generically to mean discount or retail store.

However, as pointed out by Shonac, the term "warehouse" has a variety of meanings. When asked what the word "warehouse" meant to him, Ron Stephens initially stated that it means "an area that is large, that holds product." Stephens Dep. p. 26, lines 22–23. Furthermore, according to Webster's Third New International Dictionary, "warehouse" could mean the following: a structure or room for the storage of merchandise, a wholesale establishment of the service type in which large inventories are carried, a wholesale establishment operated by a chain store organization, a place for the storing of surplus or reserve stock of merchandise by a retail store, and a public institution for the storing of goods for others. Declaration of Jane Moberg, Exhibit G. As such, the term "Warehouse Shoes" does not appear to be subject to one common public understanding so as to be considered generic. *See Gimix*, 699 F.2d at 906 (holding that, because the words "auto" and "page" were susceptible to multiple meanings, their combination could not be subject to a common public understanding and therefore was not generic).

Moreover, in *Henri's Food Products*, 817 F.2d at 1306, the court held that the term "Tas–Tee" was not a kind, genus or subcategory of salad dressings, but instead was descriptive of a quality found in many genuses of salad dressing and thus was capable of trademark protection mark if proven to convey a secondary meaning. Similarly, it appears to the court that the term "warehouse," as used in "Warehouse Shoes," is descriptive of a quality or characteristic found in many types of retail stores, the quality of discount, bargain or economy. This case thus appears to be distinguishable from *Miller Brewing Co.*, 561 F.2d at 80–81 where "light" as applied to "beer" was a word used in the beer industry to describe a type of mild beer with a lower alcoholic content. Such a definition of "light" was also found in dictionaries and reference books and was therefore found to be generic. Nor is this court persuaded by the rationale of the court in *Warehouse Foods* that "warehouse"

is necessarily a generic term and that absent another descriptive word, the title "Warehouse Foods" cannot be descriptive. At this stage of the proceedings, the court finds the term "Warehouse Shoes" appropriately descriptive such that it may be subject to trademark protection if found to have a secondary meaning.

## B. Secondary Meaning

██ The key to establishing a secondary meaning for a trade name is evidence that the relevant target group mentally identifies the trade name as the single source for the product. *Spheeris Sporting Goods, Inc.*, 157 Wis.2d at 312, 459 N.W.2d 581. The court may consider circumstantial evidence such as the length and manner of the trade name's use, the extent to which it has been advertised, exclusivity of the trade name's use, and the market that has been developed for the trade name's products and service. *Id.*

██ Mil–Mar has presented the following evidence of secondary meaning in the Greater Milwaukee area. Since 1970 Warehouse Shoes has been advertised in major newspapers, suburban newspapers and on radio and television. Stephens Aff., ¶ 6. For the past 3 years, Warehouse Shoes has spent $1.3 million annually on advertising in the Greater Milwaukee area. *Id.* at ¶ 7. A 1994 Consumer Analysis compiled by the Milwaukee Journal shows Warehouse Shoes was the largest seller of "men's shoes, dress or casual," second largest seller of "women's shoes, dress or casual," "women's athletic shoes," "men's athletic shoes," and "children's athletic shoes," and tied for 3rd largest seller of "children's shoes, dress or casual" in the Greater Milwaukee area. *Id.* at ¶ 8. Mil–Mar has a total of seventeen "Warehouse Shoes" stores, all in the Greater Milwaukee area, four of which are called "Super Warehouse Shoes." *Id.* at ¶ 4. Additionally, Mil–Mar presented the affidavits of two Milwaukee residents, Bruce Berenzweig and Max Rasansky, stating that "Warehouse Shoes" is well known in the Greater Milwaukee area as identifying "Warehouse Shoes" products and services as distinguished from its competitors.

Shonac responds to this evidence by emphasizing that it is not direct evidence. Shonac also attacks the affidavits of Stephens, Berenzweig and Rasansky as inadmissible unqualified lay testimony and the Consumer Analysis as inadmissible hearsay. As stated above, Mil–Mar may use circumstantial evidence, as set forth in the affidavit of Ron Stephens, to establish secondary meaning. The credibility of the affidavits of Rasansky and Berenzweig and the significance of the results of the Consumer Analysis affects the weight, but not the admissibility, of this evidence. Based upon its lengthy tenure and strong advertising campaign in the Greater Milwaukee area establishing "Warehouse Shoes" as a name-brand, discount shoe store, Mil–Mar has satisfied the "reasonable likelihood of success" standard that it can prove that "Warehouse Shoes" has acquired a secondary meaning.

## C. Likelihood of Confusion

██ Having found evidence that "Warehouse Shoes" may be capable of trade name protection, in order to determine whether injunctive relief is appropriate for trade name infringement, the court must inquire as to whether there is a likelihood of confusion between "Warehouse Shoes" and "DSW Shoe Warehouse." *Spheeris,* 157 Wis.2d at 308, 459 N.W.2d 581. The likelihood of confusion between two trade names depends upon whether "an appreciable number of ordinarily prudent prospective purchasers will be confused." *Id.* In determining the likelihood of confusion, the court can consider among other factors, the similarity of the parties' names, products, and locations, overlap of marketing channels used by the parties, degree of care likely to be exercised by consumers in selecting a product or service, evidence of actual confusion, the defendant's intent when selecting its name and the strength and distinctiveness of the plaintiff's trade name. *Id.; McGraw–Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1167–68 (7th Cir.1986).

As mentioned earlier, Mil–Mar has not shown intent on the part of Shonac to confuse or mislead the public. To the contrary, Shonac has opened numerous other stores

under the name of "DSW Shoe Warehouse" throughout the country. With regard to the similarities in the parties' names, Shonac uses the same words "warehouse" and "shoes" which would apparently lead to confusion on the part of consumers. The fact that the order is reversed does not make the similarity less confusing. *See In re Nationwide Industries, Inc.*, 6 U.S.P.Q.2d (BNA) 1882, 1886 (T.T.A.B.1988) ("BUST RUST" confusingly similar to "RUST BUSTER"); *Carlisle Chem. Works, Inc. v. Hardman and Holden Ltd.*, 434 F.2d 1403, 1406 (Cust. & Pat.App.1970) ("CONZIRC" confusingly similar to "ZIRCO"). Likewise, the prefix "DSW" doesn't make the name "DSW Shoe Warehouse" it less confusingly similar. *See In re Apparel Ventures, Inc.*, 229 U.S.P.Q. (BNA) 225, 225–226 (T.T.A.B.1986) ("SPARKS BY SASSAFRAS" for women's apparel confusingly similar to "SPARKS" for shoes); *In re Knight's Home Products, Inc.*, 175 U.S.P.Q. (BNA) 447, 447–48 (T.T.A.B. 1972) ("KNIGHT'S NU–LOOK" on floor polishing confusingly similar to "NU–LOOK" laundry detergent). Unlike the case of *In re Merchandise Motivation*, 184 U.S.P.Q. 364, 365 (T.T.A.B.1974), where the names "Menswear" and "MMI Menswear" were found not to result in customer confusion because "menswear" was being used by the defendant for its commonly understood, i.e. "generic" meaning (clothing for men), as discussed above, the word "warehouse," standing alone, may have many meanings.

Although Shonac submits that it sells a "high-end" shoe, it appears that the goods sold by both stores, a broad line of name-brand men's and women's shoes, are substantially similar. Shonac's intended store location is less than three blocks from a Warehouse Shoes store and is in the geographic center of Warehouse Shoes 17 stores. Stephens Aff., ¶ 11. The parties both compete for the same target consumer group, which is a substantial group consisting largely of shoe buyers who are looking for name-brand shoes at an economy price. Finally, the plaintiff has also produced evidence of actual confusion in the form of an affidavit from Deborah Logan who testified that after seeing the "DSW Shoe Warehouse" advertisement, she contacted Ron Stephens, who handles Warehouse Shoes' advertising, to sell him radio spots to advertise the opening of the new "Warehouse Shoes" store. Logan Aff., ¶¶ 2–4. Even though this may be minimal evidence of actual confusion, in light of the name recognition of Warehouse Shoes in the Greater Milwaukee area, this may portend the consumer confusion that will ensue if DSW Shoe Warehouse opens its doors.

 Shonac asserts that even if the mark "Warehouse Shoes" has acquired secondary meaning, that mark is weak and thus entitled to only a limited scope of protection. "Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir.1987). In assessing the strength or weakness of a mark, the court must conduct a two-pronged analysis. 1 McCarthy, *supra* at § 11.25[2]. First, the court ascertains the conceptual strength of the mark based upon the placement of the mark on the spectrum. Next, the court examines the commercial strength or the marketplace recognition value of the mark. *Id.*

 Here, as a "descriptive" mark in trademark terms, "Warehouse Shoes" is conceptually a weak mark. However, based upon the strong evidence of public recognition in the Greater Milwaukee area, as discussed above, "Warehouse Shoes" has become strong. The court finds unpersuasive Shonac's argument that evidence of weakness lies in the use of the term "warehouse" by other competitors. Unlike in *Steve's Ice Cream v. Steve's Famous Hot Dogs*, 3 U.S.P.Q.2d 1477, 1478 (T.T.A.B.1977), where the parties' goods and services were not identical and in *Kinark Corp. v. Camelot, Inc.*, 548 F.Supp. 429, 440 (D.N.J.1982), where the court found that the parties' hotels, located in different cities, were not in competition for ordinary travelers and would not confuse the highly sophisticated purchasers of hotel services for large bookings, Mil–Mar and Shonac have identical products and

are competing for an identical, cost conscious market.

Shonac argues that regardless of the likelihood of confusion, "DSW Shoe Warehouse" is a legally permissible fair use of "shoe warehouse" because it describes fairly and in good faith the company's goods and services. The assertion by a defendant that it is using a term only in a non-trademark, descriptive sense has been termed the "fair use" doctrine. 1 McCarthy, *supra*, § 11.17[1]. Although a minority of courts have indicated that a fair use defense can prevent a finding of infringement even where a likelihood of confusion has been demonstrated, because the primary purpose of trademark law is to protect the public from confusion, it is inconsistent to find both a likelihood of confusion and a fair use. *Id.* at § 11.17[3]; *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 n. 9 (2d Cir.1979) ("Because the primary purpose of the trademark laws is to protect the public from confusion, it would be somewhat anomalous to hold that the confusing use of another's trademark is 'fair use.' ") (citation omitted). Rather, a "fair use" may be viewed as one type of use which is not likely to cause confusion. 1 McCarthy, *supra* at § 11.17[3]. The Seventh Circuit has not as yet ruled on this issue, but this court opts for the more logical view of the Second, Fifth and Ninth Circuits that fair use cannot be a defense where a likelihood of confusion has been found. *See, Sunmark Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1059 (7th Cir.1995) (acknowledging the Second, Fifth and Ninth Circuit decisions and distinguishing them from the case at hand where the products were unrelated); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 366 n. 2 (9th Cir.1990); *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir.1983); *Dallas Cowboys Cheerleaders*, 604 F.2d at 206 n. 9. The apparent likelihood of confusion between the names "DSW Shoe Warehouse" and "Warehouse Shoes" thus precludes Shonac from relying upon a fair use defense.

## II. Adequacy of Other Remedies and Harm if Preliminary Relief Is Denied

Mil–Mar must next demonstrate that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994). It is apparent to the court that Mil–Mar will suffer irreparable and immeasurable harm to its reputation if DSW Shoe Warehouse is permitted to open its doors in the Greater Milwaukee area. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir.1988) (quoting *Processed Plastic Co. v. Warner Comm.*, 675 F.2d 852, 858 (7th Cir.1982) (noting that the Seventh Circuit has recognized that damages occasioned by trademark infringement are by their nature irreparable and not susceptible of an adequate measurement for a remedy at law)). An injunction constitutes the only form of remedy to prevent such injury.

## III. Balancing of Equities

Mil–Mar has established a reasonable likelihood of success on the merits and has demonstrated that it has no adequate remedy at law and that it will suffer irreparable harm if preliminary relief is denied. The court thus next considers the relative harm to the parties and the public interest. As discussed above, if Shonac is permitted to open its store under the DSW Shoe Warehouse name, Warehouse Shoes' longstanding reputation may be harmed. Additionally, Shonac may unfairly reap the benefits from Warehouse Shoes' expensive and extensive advertising campaign. By contrast, the harm to Shonac in delaying the opening of its store is minimal. An injunction in this case will have no adverse effect on Shonac's ability to operate its other stores, all of which lie outside of Wisconsin, or to proceed with the opening of additional stores outside of this area. Furthermore, since Shonac has not yet opened a store in the Greater Milwaukee area, anticipated profits for the period in which opening might be delayed would be speculative. Lastly, if the court later finds the injunction was improvidently granted, the bond posted by Mil–Mar should cover Shonac's expenditures to date.

As to the public interests, the court recognizes that the public has an interest in free

competition and the ability to obtain the lowest prices. *See Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.,* 815 F.2d 500, 505 (8th Cir.1987). This interest must however be weighed against the right of Mil–Mar or any other business to have its name protected against infringement. As the legislative history of the Lanham Trade–Mark Act, 15 U.S.C. § 1051, *et seq.,* recognizes, "[t]o protect trade-marks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." S.Rep. No. 1333, 79th Cong., 2d Sess. (1946), *reprinted in* 1946 U.S.C.C.A.N. 1274, 1275. In light of all of the above factors, the court grants the plaintiff's request for a preliminary injunction.

## IV. Posting of Security

▮ Where the court issues a preliminary injunction, the movant is ordinarily required to provide security "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). The amount of the security bond is a matter which falls within the discretion of the court. *Maidenform, Inc. v. Munsingwear, Inc.,* 195 U.S.P.Q. (BNA) 297, 502, 1977 WL 22713 (S.D.N.Y.1977). Shonac requests that, if Mil–Mar is successful, Mil–Mar be required to post a bond for $500,000. In support of its request, Shonac asserts that in opening a new store with sales projections similar to the store it seeks to open in this case, it typically spends approximately $75,000 every six months in advertising, $17,000 for signs and $5,000 for printing costs. Shonac further projects spending $100,000 to $200,000 for operating and advertising under a temporary name, and projects that these costs will double when it changes its temporary name back to "DSW Shoe Warehouse." Shonac additionally seeks money for damage to goodwill and reputation in changing its name. Mil–Mar has not opposed the requirement of security but responds that a $15,000 bond would be appropriate.

However, unlike in *Maidenform, Inc. v. Munsingwear, Inc.,* 195 U.S.P.Q. (BNA) 297, 303, 1977 WL 22713 (S.D.N.Y.1977) where the court directed the plaintiff to post security in the amount of $300,000 on the basis of affidavits establishing that $200,000 had already been expended for advertising plus $100,000 for possible additional damages, Shonac will incur the above costs regardless of whether it opens a store now or if that opening is delayed by six months. Signs and business documents which have already been printed could possibly be used for other "DSW Shoe Warehouse" stores, depending on whether or not an address is indicated. As to the $100,000 to $200,000 projected cost for operating and advertising under a temporary name, it has not been established that the full value of such expenditures will be lost. For example, if Shonac ultimately prevails and is able to use the "DSW Shoe Warehouse" name in four to six months, there will be additional expenditures to notify the public of the name change, but if present customers remain, not all the monies previously spent will have been for naught. If Shonac decides to open under a temporary name, there will be expenditures for operating and advertising and some of that money will be lost if Shonac prevails. As to the $200,000 to $400,000 projected cost for then changing the temporary name back to "DSW Shoe Warehouse," and additional sums for alleged damage to reputation in making such a name change, any such amounts are speculative at this time. Certainly, Shonac will not expend these costs prior to the outcome of this suit.

Mil–Mar cites to two cases to establish that security in the $10,000 to $15,000 range has generally been required in trademark infringement cases in this district. *See e.g., Fishing Hot Spots, Inc. v. Simon & Schuster,* 720 F.Supp. 746, 747 (E.D.Wis.1989) (setting bond at $15,000); *Karen Industries, Inc. v. Chiaverotti,* 181 F.Supp. 827, 830 (E.D.Wis.1960) (setting bond at $10,000). The court acknowledges that these are old cases as far as the amount of money involved is concerned, but to date, Shonac has made only a modest investment in the Greater Milwaukee area. At the hearing, counsel for

Shonac indicated that its projected opening in this area is now scheduled for the end of November, having been delayed from an October date. As Shonac has provided only slight evidence of money already expended as of this date, the court will require the plaintiff to post a bond in the amount of $20,000. If and when Shonac opens a store under a temporary name, the court is willing to reconsider the amount of the bond. In the event Shonac is able to make a more definite showing of expenditures that may be lost by an improvidently granted injunction, the court will adjust the amount of the bond accordingly.

IT IS THEREFORE ORDERED that:

1. The plaintiff's motion for preliminary injunction is granted. The defendant is hereby preliminarily enjoined, pending the trial or other disposition of this action, from using in any manner the name "DSW Shoe Warehouse," "Shoe Warehouse" or any other name confusingly similar to "Warehouse Shoes" in the Greater Milwaukee area.

2. The plaintiff shall post security in the amount of $20,000 with the Clerk of Court. In the event the bond is not posted by October 16, 1995, the preliminary injunction will be vacated.

3. Plaintiff's request to file a reply brief exceeding 15 pages is granted.

4. Plaintiff's request to take judicial notice regarding the name "Warehouse Shoes" is denied.

5. The court will conduct a telephone conference with counsel on October 26, 1995, at 4:00 p.m., to discuss further pretrial processing of this case. The court will initiate the call.