6 F.3d 1225
 62 USLW 2228, 28 U.S.P.Q.2d 1385
 NIKE, INCORPORATED, an Oregon corporation, Plaintiff-Appellee,
v.
"JUST DID IT" ENTERPRISES, a business of unknown legal
character, and Michael Stanard, an Illinois
resident, Defendants-Appellants.
 No. 92-3303.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 1, 1993.
Decided Sept. 28, 1993.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 25, 1993.
 
 James Adducci, James L. Komie, Schuyler, Roche & Zwirner, Chicago, IL, Alan S. Cooper (argued), Eric T. Fingerhut, Banner, Birch, McKie & Beckett, Washington, DC, for plaintiff-appellee.
 Walter P. Maksym (argued), Oak Brook, IL, for defendants-appellants.
 Before BAUER, Chief Judge, and MANION and ROVNER, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Humor, like beauty, is in the eyes of the beholder. When artist Michael Stanard designed and sold t-shirts and sweatshirts with a "swoosh" design identical to Nike, Inc.'s, but with the word Mike instead, Nike saw no humor and sued for trademark infringement. Stanard responded with a parody defense. The district court granted Nike's motion for summary judgment, 799 F.Supp. 894. We reverse and remand.
 
 I. Background
 
 2
 Nike manufactures and markets footwear, apparel and related accessories. To identify with its products, it has used the word NIKE and/or a swoosh design as its trademarks.[1] Since 1971, Nike has invested substantial sums in promoting its products. For example, from 1977 through 1991, Nike spent more than three hundred million dollars advertising the trademarks, now known to nearly every athlete and sports fan in the world. Aggregate sales revenues since 1971 for items bearing the trademarks have exceeded ten billion dollars. Beginning in 1989, Nike has used the phrase JUST DO IT as a slogan for its sweatshirts; the slogan has been subsequently used on t-shirts, caps and other accessories.[2] Aggregate sales of JUST DO IT items have exceeded fifteen million dollars. As a result of these expenditures, NIKE, the swoosh design, and JUST DO IT have gained widespread public acceptance and recognition.
 
 
 3
 Stanard is an award-winning commercial artist whose works include, among others, the trademark "Louisville Slugger," printed on its baseball bats. As a summer project, he and his daughter decided to market his first name, Mike, as a takeoff on the NIKE logos. They named the enterprise JUST DID IT. Stanard marketed t-shirts and sweatshirts ($19.95 to $39.95) to the general public with the given or first name of Michael, focusing on the northern suburbs of Chicago. He also mailed brochures to college athletes and celebrities named Michael. Approximately two-thirds of those purchasing his shirts were named "Mike." Stanard asserts that the other one-third probably bought a t-shirt for a friend, relative or loved one named "Mike." Although JUST DID IT Enterprises mailed over 1,400 brochures, the project lost money.
 
 
 4
 Only one letter separates MIKE from NIKE. Even Stanard admits that a person might not notice the difference between the two from across the room. In fact, Stanard admitted that his "whole point" was to give someone viewing from a distance the impression that the shirt actually read NIKE. In essence, Stanard believes that the word play (such as his own personal logo of STANARD with the background of the Standard Oil trademark) is humorous and deserves First Amendment protection as a fair use of trademarks. He sees this whole matter as a "joke on Nike's image which has become a social phenomenon," a "trick upon the perception of the viewer," and his own "personal pun." The district court disagreed. Although the record contains no mention that anyone ever actually confused the two designs, the court concluded as a matter of law that MIKE and NIKE were too similar and likely to confuse consumers. The court granted Nike's motion for summary judgment and this appeal followed.
 
 II. Discussion
 
 5
 Trademarks consist of words or symbols that identify and distinguish goods for the benefit of consumers. 15 U.S.C. Sec. 1127. Manufacturers and merchants invest a great deal in trademarks for the good will of their businesses. Obviously they hope the public at large identifies their trademarks. When businesses seek the national spotlight, part of the territory includes accepting a certain amount of ridicule. The First Amendment, which protects individuals from laws infringing free expression, allows such ridicule in the form of parody. Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Webster defines parody as "a writing in which the language and style of an author or work is closely imitated for comic effect or in ridicule...." Webster's International Dictionary (3d ed. 1981). Parodies date as far back as Greek antiquity. SeeL.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 28 (1st Cir.), cert. denied, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987); see alsoAcuff-Rose Music, Inc. v. Campbell, 972 F.2d 1429, 1440 (6th Cir.1992) (Nelson, J., dissenting), cert. granted, --- U.S. ----, 113 S.Ct. 1642, 123 L.Ed.2d 264 (1993).
 
 
 6
 Parody or satire, as we understand it, is when one artist, for comic effect or social commentary, closely imitates the style of another artist and in so doing creates a new art work that makes ridiculous the style and expression of the original.
 
 
 7
 Rogers v. Koons, 960 F.2d 301, 309-10 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).
 
 
 8
 But parodies have a legal hurdle to overcome. Federal law prohibits copies or imitations that confuse consumers. 15 U.S.C. Secs. 1114(1)(a), 1125(a). This protects trademarks as a form of intellectual property, L.L. Bean, 811 F.2d at 29, and guards against confusion, deception or mistake by the consuming public. SeeJames Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 274 (7th Cir.1976) ("people do not confuse trademarks--trademarks confuse people" (citations omitted)).
 
 
 9
 To prevail against an alleged abuser, the plaintiff "must show a valid trademark and a likelihood of confusion on the part of the public." A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903, 906 (7th Cir.1986); see McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1167 (7th Cir.1986). The parties do not dispute that Nike has secured valid trademarks in the terms NIKE and/or its Swoosh Design and JUST DO IT. The ultimate question presented in this case is whether Stanard's goods confuse customers. Parodies do not enjoy a dispensation from this standard. In the more common commercial exploitation arena, seeCliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc., 886 F.2d 490, 495 & n. 3 (2d Cir.1989), the court is required to consider several factors when assessing whether or not there is a likelihood of confusion by the general public:
 
 
 10
 the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another.
 
 
 11
 Helene Curtis Indust., Inc. v. Church & Dwight Co., Inc., 560 F.2d 1325, 1330 (7th Cir.1977), cited with approval inMcGraw-Edison, 787 F.2d at 1167-68. This list is not exclusive, nor does any one factor end our inquiry. McGraw-Edison, 787 F.2d at 1168; Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980). For example, the court might also consider the marketing channels used by the parties. Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 833 (6th Cir.1983); Toho Co., Ltd. v. Sears, Roebuck & Co., 645 F.2d 788, 790 (9th Cir.1981); seeWalt Disney Prods. v. Air Pirates, 581 F.2d 751, 759 (9th Cir.1978) (the court should have considered that the defendant's parody was sold only in adult, counter-culture stores). Courts need to consider a variety of factors affecting the relationship between the adverse parties and the perception of the product by the intended and actual consumer. Of course, the primary consideration in this case is parody.[3] The district court concluded that parody was not an affirmative defense, but "another factor to be considered in determining the likelihood of confusion." We have already held that to prevail, the plaintiff "must show a valid trademark and a likelihood of confusion on the part of the public." A.J. Canfield Co., 796 F.2d at 906. Whether a customer is confused is the ultimate question. If the defendant employs a successful parody, the customer would not be confused, but amused. SeeJordache Enters., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir.1987). Thus, we agree with the district court that parody is not an affirmative defense but an additional factor in the analysis.
 
 
 12
 [T]he keystone of parody is imitation. It is hard to imagine, for example, a successful parody of Time magazine that did not reproduce Time's trademarked red border. A parody must convey two simultaneous--and contradictory--messages: that it is the original, but also that it is not the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.
 
 
 13
 Cliffs Notes, 886 F.2d at 494. Thus the parody has to be a takeoff, not a ripoff.
 
 
 14
 In the end, we must simply ask whether a retail customer buying a shirt from JUST DID IT Enterprises with the name MIKE on a swoosh design would likely believe that it is "in some way related to, or connected or affiliated with, or sponsored by," the plaintiff NIKE. SeeBeefeater, 540 F.2d at 274. Thus, customer "confusion" need not be restricted to a mistake regarding the source of the goods; the court should also consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product. SeeTetley, Inc. v. Topps Chewing Gum, Inc., 556 F.Supp. 785, 789 (E.D.N.Y.1983); Stop The Olympic Prison v. United States Olympic Comm., 489 F.Supp. 1112, 1121-22 & n. 31 (S.D.N.Y.1980) (and cases cited); Grey v. Campbell Soup Co., 650 F.Supp. 1166, 1173 (C.D.Cal.1986) (whether infringing product has "some connection" with the trademark (citation omitted)); Anheuser-Busch, Inc. v. Balducci Publications, 814 F.Supp. 791, 794 (E.D.Mo.1993) (issue is whether under all of the circumstances "there is a likelihood of confusion as to source, sponsorship or affiliation"). Likelihood of confusion is frequently a disputed issue upon which reasonable minds may differ. Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 246 (2d Cir.1983).
 
 
 15
 Stanard has forthrightly proclaimed his knowledge of Nike's marks and his attempt to create a parody of them. Some observers may not think his creation is funny. That does not much matter. What matters is whether the "Mike" shirts confused the consuming public into thinking that they were a Nike product. Based on the facts of record, this court cannot conclude that confusion reigns unless the plaintiff presents undisputed facts showing that it is entitled to relief as a matter of law. Thus, we must analyze several factors relevant to the likelihood of confusion.
 
 A. Similarity of Trademarks
 
 16
 Our initial inquiry concerns the degree of similarity between the trademark and parody in appearance and suggestion. Helene Curtis, 560 F.2d at 1330. The similarity issue also considers how the words are pronounced, the verbal translation of any graphic designs and whether they suggest similar ideas or meanings. SeeJordache, 828 F.2d at 1484-85; Squirtco, 628 F.2d at 1091 (courts should also consider visual impression and sound). The district court concluded that the marks were virtually identical.
 
 
 17
 The marks are no doubt similar; save one letter they are identical. Obviously if a humorist wished to parody NIKE, using a variation of the name or swoosh design would necessitate some identification of the original. Stanard certainly accomplished that. The parties do not dispute that only one letter separates MIKE from NIKE and that a person could not tell the difference between the two from across the room. The parties do dispute whether NIKE and MIKE would be pronounced the same.
 
 
 18
 Stanard argues that a customer interested in purchasing a t-shirt or sweatshirt covered with the word NIKE and its swoosh design is not interested only in the quality of the merchandise but also in associating with a major sportswear company. NIKE is not merely a brand name printed on a tab at the back of the collar, but a statement about the person wearing it to those viewing the item. Thus, whether it connotes a parody depends in large part on whether the public would actually read the t-shirt or sweatshirt in question. That a person cannot tell the difference between the two from across the room matters little. We are dealing here with customer confusion when choosing to purchase, or not purchase, the items, not public confusion at viewing them from afar. Beefeater, 540 F.2d at 266 (the "consuming public"); Cliffs Notes, 886 F.2d at 495 ("likelihood that an ordinary prudent purchaser" would be confused).
 
 
 19
 The district court did not compare the slogan JUST DO IT with the name of Stanard's enterprise, JUST DID IT, and the parties only briefly address the matter. We believe in the context of this case, however, the comparison is important. Stanard does not sell his shirts off the rack at stores. His was a mail-order business. To purchase a shirt, the customer had to make a check payable to JUST DID IT Enterprises. Not so with Nike. There is no evidence in the record that Nike sells shirts through the mail, or whether consumers can purchase products directly from Nike or must rather go through a dealer. Nike asserts JUST DO IT is its slogan, not the name of the business to which customers make checks payable in order to receive Nike products. Certainly Nike would not have us compare the similarity of MIKE and NIKE on actual shirts, because the customer never sees the actual MIKE shirt until after purchasing it. Thus, in order for a customer to be confused in this case, he must see MIKE as similar to NIKE, and continue to be confused while making a check out to JUST DID IT Enterprises.
 
 
 20
 After examining the size of the word MIKE and the mail-order form used for customer purchasing, we cannot conclude, as did the district court, that as a matter of law the parody and trademark are so similar as to confuse the consumer. Yes, they are similar; but similarity alone does not end the inquiry. A jury could find that MIKE and NIKE, in text, meaning, and pronunciation, are not so similar as to confuse consumers, especially when making the decision to purchase or not to purchase. A jury could also find that ordering a shirt from JUST DID IT Enterprises would not confuse a consumer, considering that Nike uses JUST DO IT only as its slogan.
 
 
 21
 B. Similarity of Products and Concurrent Uses
 
 
 22
 Our next inquiry concerns the similarity of the products upon which MIKE and NIKE attach. Where the goods are in close competition, trademarks need not be as similar in order to find an infringement. SeeSquirtco, 628 F.2d at 1091 (also consider costs and conditions of purchase); Universal City Studios, Inc. v. Nintendo Co., Ltd., 746 F.2d 112, 116 (2d Cir.1984) (court can also consider "total concept and feel," to determine whether there is a fair jury issue on the likelihood of confusion, citingWarner Bros., 720 F.2d at 241, 246). The parties have not disputed that Stanard has manufactured and marketed its parody on the same types of items that Nike sells. The district court was thus correct in concluding that as a matter of law Nike's trademark and Stanard's parody dealt with similar products, used for similar purposes.
 
 C. Marketing Channels
 
 23
 Nike obviously markets its products to the general public. The parties dispute, however, the effect of Stanard's distribution. Stanard asserts that he marketed the clothing only to that part of the general public with the given or first name of Michael. Although the parties do not dispute that two-thirds of the purchasers were named "Mike," they dispute whether the other one-third bought a shirt for a friend, relative or loved one named "Mike." The district court did not specifically rule on this issue. The court simply observed that people named Mike were part of a consumer market.
 
 
 24
 In addressing whether summary judgment for Nike was proper, we must infer that Stanard specifically targeted his parody to an audience that would appreciate (more so than the general public) the distinction between MIKE and NIKE. The district court and the parties have assumed that this inquiry focuses on the identity of the customer. However, how the parties market the product is also relevant. Stanard marketed the MIKE shirts strictly by mail-order to people with a first name of Mike. Nike has not shown in the record whether or how it uses the mail for marketing. Although the markets may overlap, a jury could find on this record that Stanard utilizes a completely different marketing channel than Nike. A jury could also conclude that Stanard's targeted market would not have been likely to purchase a shirt emblazoned with Nike instead of Mike.
 
 D. Consumer Care
 
 25
 The parties dispute the degree of care consumers would likely exercise when purchasing these products. Stanard's short sleeve t-shirt sold for $19.95; the long sleeve, $24.95; and the sweatshirt, $39.95. Nike argued, and the district court agreed, that these prices support a conclusion that customers would not exercise a high degree of care in purchasing the shirts. We cannot agree. Neither Nike nor the district court has cited any case where a customer's degree of care depends solely upon price. In any event, we cannot agree that as a matter of law customers routinely purchase a $39.95 item without looking carefully at the product information. The record contains no evidence on the degree of care customers might exercise because of the type of merchandise at issue. Thus, absent any evidence to the contrary, a jury could conclude that customers take care when purchasing this type of clothing. A jury could also consider evidence of just who would and would not typically purchase a NIKE-labeled shirt. One group of purchasers might seek out the Nike name to ensure top quality and to display to others their good taste for such quality. On the other hand, some purchasers might resent paying a premium to be a walking billboard and would relish the opportunity to mock trendy folks who wear labels on their sleeves.
 
 E. Trademark Strength
 
 26
 The stronger the trademark the greater protection received from the courts. SeeSquirtco, 628 F.2d at 1091. This factor can also include the likelihood of expansion of the product lines. SeeGrey, 650 F.Supp. at 1173. The parties do not dispute the validity of Nike's trademarks, nor their strength. We agree with the district court's conclusions that Nike's trademarks are widely recognized and deserve protection.
 
 F. Actual Confusion
 
 27
 Proof that a trademark parody actually confuses consumers provides substantial evidence in proving likelihood of confusion. Beefeater, 540 F.2d at 277-79 (as a matter of law survey showing 15% of customers confused evidences a likelihood of customer confusion); seeSquirtco, 628 F.2d at 1091; Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 400-02 (8th Cir.1987); World Carpets, Inc. v. Dick Littrells New World Carpets, 438 F.2d 482, 489 (5th Cir.1971). And vice-versa, "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1136 (2d Cir.1979). Stanard asserted the names of many individuals who were not confused by the parody. Nike responded with no evidence of actual confusion. While actual confusion is not essential to show likelihood of confusion, Nike still must demonstrate why a customer could conclude Stanard's shirt was a Nike product. Nike has not done this, leaving an open question where a jury could conclude that Stanard's trademark parody would not likely confuse a purchaser.
 
 G. Intent of the Parodist
 
 28
 An intent on the part of Stanard to palm off his products as those of another would raise an inference that the consumer would likely be confused. Squirtco, 628 F.2d at 1091. An intent to parody, however, raises the opposite inference. Jordache, 828 F.2d at 1486. Given the parody defense, the question is whether the intent was to confuse or amuse. Id.
 
 
 29
 No one likes to be the butt of a joke, not even a trademark. But the requirement of trademark law is that a likely confusion of source, sponsorship or affiliation must be proven, which is not the same thing as a "right" not to be made fun of.
 
 
 30
 Id., citing 2 J. McCarthy, Trademarks and Unfair Competition, Sec. 31:38 at 670 (2d ed. 1984). "It is true that some ... parodies ... contain visual gags. But parody may be sophisticated as well as slapstick; a literary work is a parody if, taken as a whole, it pokes fun at its subject." Cliffs Notes, 886 F.2d at 495-96.
 
 
 31
 The district court concluded that Stanard intended to pass off his merchandise as that of Nike. The court noted that Stanard had actual and constructive notice of Nike's trademarks, desired to benefit from Nike's advertising and promotion, and that someone from across the room would think that NIKE and MIKE were identical. These factors do not support the court's conclusion. The district court rested on Stanard's statement that to be initially tricked at first glance from across the room was "the whole point." But a jury could surely conclude that any initial confusion ends with a closer look, when the observer "gets it."
 
 
 32
 Parodies do not exist by mere happenstance. Actual knowledge of the trademark by the presenter as well as the observer or consumer is virtually required. When determining whether Stanard intended to amuse or confuse, it matters not whether he benefitted from Nike's advertising and promotions. Nor is it relevant how he expected to promote his parody. Advertising and promotion are valid considerations when examining marketing channels (see Part C, supra ), but not for determining his intent. We have already rejected any "across the room" test for intent to confuse a consumer, especially since Stanard sells the shirts by mail-order.
 
 
 33
 Throughout this case Stanard has asserted that he intended only to poke fun at Nike's corporate identity. He intended to use his own name to play a witty prank upon the perception of the viewer. Whether a customer would also believe that MIKE was somehow affiliated with NIKE is a disputed issue of fact. On the record as it now stands we conclude that a jury could infer that Stanard intended to amuse, not confuse, and that MIKE was intended as a parody, not an imitation designed to be passed off to purchasers as a Nike product.
 
 H. Additional Authority
 
 34
 The parties have directed our attention to numerous cases involving trademark parodies. Many involve the district court ruling on a motion for preliminary injunction, which even if appealed would have been entitled to deference. Universal City Studios v. T-Shirt Gallery, Ltd., 634 F.Supp. 1468, 1477 (S.D.N.Y.1986) (court denied preliminary injunction finding MIAMI MICE a valid parody of MIAMI VICE); Hard Rock Cafe Licensing v. Pacific Graphics, 776 F.Supp. 1454 (W.D.Wash.1991) (court granted preliminary injunction finding HARD RAIN CAFE likely to confuse consumers regarding HARD ROCK CAFE trademark); Coca-Cola Co. v. Gemini Rising, Inc., 346 F.Supp. 1183 (E.D.N.Y.1972) (court granted preliminary injunction finding ENJOY COCAINE not a valid parody of ENJOY COCA-COLA where both employed familiar red and white logo). Likewise, one case involved a district court decision after a trial on the merits, which again, even if appealed would have been entitled to deference. Olympic Prison, 489 F.Supp. at 1123 (after trial, court found that STOP THE OLYMPIC PRISON using the Olympic Committee's trademark of five interlocking rings was not likely to confuse people into thinking it was "produced, sponsored or in any way authorized by the Olympic Committee.") Two cases involved the circuit courts reviewing a district court's decision after trial--again, deferentially. Jordache, 828 F.2d at 1485 (court affirmed district court judgment after trial that LARDASHE was a valid parody of JORDACHE, where dissimilarities in the accompanying design showed they were obviously different); Novak, 836 F.2d 397 (court affirmed district court's granting of permanent injunction after trial that MUTANT OF OMAHA and subtitle NUCLEAR HOLOCAUST INSURANCE was not a valid parody of MUTUAL OF OMAHA).
 
 
 35
 The parties have cited, and we have found, only three cases ruling on trademark parodies as a matter of law. All three counsel in favor of reversing the grant of summary judgment to the plaintiff in this case, and at the least in favor of a trial on the merits. Toho, 645 F.2d at 790-91 (district court affirmed in granting the defendant's motion to dismiss, concluding that BAGZILLA was a permissible pun of GODZILLA and did not confuse consumers); Cliffs Notes, 886 F.2d 490 (district court's granting of preliminary injunction vacated; the Second Circuit concluded SPY NOTES was a valid parody of CLIFF NOTES); Air Pirates, 581 F.2d at 753 & 759 (the Ninth Circuit reversed the district court's granting of summary judgment to the plaintiff where SILLY SYMPHONY was parodied by SILLY SYMPATHIES, a magazine depicting Disney characters as "free thinking, promiscuous, drug ingesting counterculture"; each design used a musical staff for the title letters). There is no cause for deference here. Neither we nor the district court can conclude as a matter of law that Stanard's parody does or does not confuse the purchasing public. Too many disputed facts require a trial for resolution.
 
 III. Conclusion
 
 36
 Nike has shown that, as a matter of law, certain factors show customers might be confused when purchasing a shirt reading MIKE, rather than NIKE. They involve similar products with similar uses, and jeopardize a very strong trademark. However, the record leaves open the possibility that a jury could infer that customers would not confuse MIKE with NIKE. Customers purchase the MIKE shirts through the mail and must make the check payable to JUST DID IT Enterprises. We have no idea if Nike employs similar marketing. Stanard targeted a specific audience of consumers named Mike, who could exercise enough care to tell the difference. The mailed letter and order blank emphasize the "Mike" distinction. No identified customer has been confused by the prank, and Stanard intended only to parody the Nike corporate image. Whether customers would confuse MIKE and the swoosh design as affiliated with NIKE is a question of fact over which reasonable minds may differ.
 
 
 37
 The district court obviously felt MIKE and JUST DID IT Enterprises was not a valid parody of NIKE and its JUST DO IT slogan. But when all of the disputed facts are before it a jury may well disagree. Throughout its decision, the district court made several findings of fact, in the end finding that MIKE likely confuses consumers. Although district courts are expert in finding facts, at the summary judgment stage disputed facts must be reserved for the jury. The court erred in granting summary judgment to the plaintiff, and accordingly is REVERSED and the case REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 Nike has registered the trademarks NIKE, the swoosh design, and the NIKE and swoosh design with the U.S. Patent and Trademark Office under Registration Nos. 1,277,066; 1,284,385; and 1,237,469, respectively. Stanard does not contest their validity
 
 
 [2]
 JUST DO IT is not a registered trademark. The district court found that because of its inherently distinctive attributes as applied to NIKE goods, it was entitled to trademark protection under the common law. Stanard does not contest this ruling, and we assume, without deciding, that NIKE has adequately protected the trademarks at issue in this case
 
 
 [3]
 Nike, however, assumes with neither citation nor argument that parody is an affirmative defense. Stanard, in reply, assumes a totality of the circumstances test. In Eveready Battery Co., Inc. v. Adolph Coors Co., 765 F.Supp. 440, 450 (N.D.Ill.1991), the district court concluded that parody was an affirmative defense. However, the court relied solely upon Cliffs Notes, 886 F.2d at 494, which employed a balancing approach. "[O]nly where the public interest in avoiding consumer confusion outweighs the public interest in free expression" should the court uphold a trademark in the face of the first amendment, citing Rogers v. Grimaldi, 875 F.2d 994, 998-99 (2d Cir.1989). Cliffs Notes, 886 F.2d at 494