**MAYFLOWER TRANSIT, INC., Transport Service of Indiana, Inc. and Gentry Insurance Agency, Inc., Plaintiffs,**

v.

**ANN ARBOR WAREHOUSE CO., INC. d/b/a Godfrey Moving & Storage, Phoenix Moving Systems, Inc. and American Red Ball Worldwide Movers, Inc., Defendants.**

No. IP 94–1930 C B/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 11, 1995.

Ronald J. Waicukauski, A. Kristine Lindley, White & Raub, Indianapolis, IN, for plaintiffs.

Timothy A. Fusco, Keith A. Schofner, Kramer Mellen, Southfield, MI, Thomas E. Daniels, Pear Sperling Eggan & Muskovitz, P.C., Ypsilanti, MI, Virgil L. Beeler, Baker & Daniels, Indianapolis, IN, for defendants.

## ENTRY

BARKER, Chief Judge.

This matter is before the Court on the motion of Mayflower Transit, Inc., Transportation Service of Indiana, Inc., and Gentry Insurance Agency, Inc. (collectively "Mayflower"), for preliminary injunctive relief. For the reasons set forth below, the motion is granted.

## I. FACTUAL BACKGROUND.

The plaintiffs in this action, Mayflower Transit, Inc., Transport Service of Indiana, Inc. and Gentry Insurance Agency, Inc., are all Indiana corporations with their principal places of business in Carmel, Indiana. Mayflower is an interstate transporter of household goods whose gross revenues for "line haul," *i.e.* the transport of such goods across state lines, totaled over $280 million in 1994. Defendants Ann Arbor Warehouse Company, Inc., d/b/a Godfrey Moving & Storage ("Godfrey") and Phoenix Moving Systems, Inc., ("Phoenix") are Michigan corporations with their principal places of business in Ann Arbor, Michigan. Phoenix is a recently-formed intrastate moving company with gross receipts totaling $285,000 for the first six months of 1995. Godfrey is currently in the final phase of liquidating its assets, having filed a Chapter 11 Petition on November 29, 1994.

From January 10, 1986, until October 10, 1994, Godfrey operated as a local booking agent for Mayflower. Under the terms of the agency agreement entered into between the two companies, Godfrey assisted Mayflower in certain local activities required in the moving and storage business, such as accepting, packing and arranging for the transportation by motor carrier of personal goods in the name of Mayflower.

In response to nagging financial troubles, Godfrey began liquidating its assets in the Fall of 1994. On October 3, 1994, several high-level employees left Godfrey to form Phoenix,[1] a newly-formed moving and storage company which is currently acting as a local booking agent for American Red Ball Worldwide Movers, Inc. ("Red Ball"). On October 10, 1994, Godfrey terminated its agency agreement with Mayflower and subsequently "sold" the use of its phone numbers to Phoenix for a sum of $271,600.[2] Kari Ludka, the president of Phoenix and former marketing director at Godfrey, testified that

the $271,600 sum was chosen because it reflected the total debt that Godfrey owed Thomas Lopinski, the president of Godfrey and Ms. Ludka's father, not because that number represented the purported value of the phone lines. Mr. Lopinski agreed to release Godfrey from that debt in exchange for a promise from Ludka, his daughter, that Phoenix will hire him if and when it becomes financially able to do so. To underscore the lack of arms-length bargaining that characterized this transaction, no money has been paid for the numbers to date, and according to Ludka, no money is ever expected to be paid for these numbers.

According to both parties, telephone directory listings in the yellow pages are an important source, perhaps the most important source, of business and potential customers in the moving business. Godfrey currently has telephone listings in eleven 1994–95 directories throughout the Ann Arbor area. These listings appear generally in the "Movers" section of the yellow pages under the "Mayflower" name. As a result, when potential customers in the Ann Arbor area consult the yellow pages and attempt to dial the number of their local Mayflower agent, they reach Phoenix, a Red Ball agent.

Complicating matters is the personal saga of Mr. Timothy Gendreau, who contracted with Mayflower—through Godfrey—in August, 1994, to store and later ship his household effects. On October 26, 1994, Mr. Gendreau appeared at Godfrey's warehouse, only to learn that Godfrey was in the process of going out of business. He demanded to see his belongings and, though the testimony received on this matter is highly contradictory, allowed his belongings to be transferred to Phoenix's new facility in another part of Ann Arbor later that same day for continued storage. Mr. Gendreau then wrote a single check to Phoenix to pay both for past storage fees owed to Godfrey and future fees owed to Phoenix.[3] Over the next few months, howev-

---

1. For example, Godfrey's vice president, general manager, director of sales and marketing, and operations general manager all assumed similar positions with the newly-formed Phoenix.

2. The phone numbers in question are (313) 769–4100, (313) 229–2280, (517) 322–2111, (313) 293–6300, and (800) 388–4469.

3. Thomas Lopinski and Kari Ludka each testified that Gendreau was allowed to pay both bills—*i.e.*

er, Mr. Gendreau refused to pay anything further, arguing that pursuant to his agreement with Godfrey–Mayflower, he would not have to pay certain storage and packing charges. On April 10, 1995, Phoenix sent Mr. Gendreau a "Final Notice of Sale" stating that if Phoenix did not receive payment for past packing and loading, cartage into storage and accumulated storage charges, Phoenix would auction off his property.[4]

On November 22, 1994, Mayflower filed the present suit [5] seeking both damages and injunctive relief under various breach of contract, state tort and federal Lanham Trademark Act theories. On May 8, 1995, Mayflower filed the instant motion seeking a preliminary injunction against the defendants. Specifically, Mayflower argues (1) that Godfrey, by transferring its phone numbers to Phoenix, breached portions of its agency agreement with Mayflower that required it to transfer its telephone numbers to Mayflower upon termination of the agreement, and (2) that Phoenix's use of Godfrey's previous numbers constitutes an infringement of Mayflower's federally registered trademark to the extent that customers consulting telephone directories seeking Mayflower's number receive the number for Phoenix, the local agent of a direct competitor. Mayflower thus asks the Court to "prohibit the defendants from refusing to execute appropriate documents to transfer to Mayflower telephone numbers listed under Mayflower's name." (Verified Motion for Second Preliminary Injunction, p. 1).

## II. ANALYSIS.

### A. Injunction Standards

■ To obtain a preliminary injunction, Mayflower must make a threshold showing of establishing (1) some likelihood of prevailing on the merits, and (2) that in the absence of the injunction, it will suffer irreparable harm for which there is no adequate remedy at law. *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1453 (7th Cir.1995); *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 313–314 (7th Cir.1994); *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992). If Mayflower meets these two conditions, then the Court must "balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently. The balancing involves a 'sliding scale' analysis: the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor. In addition the court must consider the public interest in whether the injunction is to be granted or denied." *Storck USA,* 14 F.3d at 314; *accord Abbott Laboratories,* 971 F.2d at 12.

### B. Likelihood of Success on the Merits

■ "Equity jurisdiction exists only to remedy legal wrongs; without some showing of a probable right there is no basis for invoking it." *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 387 (7th Cir.1984). Thus, as a threshold matter, Mayflower must establish a likelihood of prevailing on the merits. To make such a showing, Plaintiff must demonstrate at a minimum that its chance of ultimately prevailing is "better than negligible." *Kinney v. Int'l Union of Operating Engineers,* 994 F.2d 1271, 1278 (7th Cir.1993) *quoting Illinois Council on Long Term Care v. Bradley,* 957 F.2d 305, 307 (7th Cir.1992).

### (1). Mayflower Is Likely to Prevail on Its Breach of Contract Claim.

Paragraph 17(f) of the agency agreement between Godfrey and Mayflower states that

---

4. Ultimately, the parties entered into a stipulation regarding Gendreau's goods prior to the hearing, thus mooting the issue for purposes of the present motion.

5. The Complaint was amended on May 8, 1995, to include Phoenix and Red Ball as defendants. Mayflower has since moved to voluntarily dismiss Red Ball from this suit without prejudice and, on June 28, 1995, the Court granted the motion.

the Godfrey storage bill and the Phoenix storage bill—with one check to Phoenix for several reasons. First, Gendreau only had one check in his wallet. Second, because Godfrey was involved in bankruptcy proceedings, if the check was written to Godfrey, Phoenix might never receive its share. Finally, Phoenix wanted to gain Mr. Gendreau as a storage customer and, hopefully, become the booking agent for his potential move to Seattle.

"on termination of this agreement," Godfrey agrees it "will have no further right to use any telephone number listed under any name of which the term 'Mayflower' or the term 'Aero Mayflower' is a part, and [Godfrey] agrees, at the request of [Mayflower], to execute all documents required by the telephone authorities to have calls for any such number ... transferred to [Mayflower], or its nominee." (Agency Agreement, Plaintiff's Ex. 1, ¶ 17(f)). According to Mayflower, the intent embodied in this provision could hardly be more clear: upon termination of the agency relationship between Godfrey and Mayflower, Godfrey (1) forfeits its right to continue using any phone numbers appearing in local directories under Mayflower's name and/or service marks, and (2) agrees to execute the documents necessary to transfer control of the numbers back to Mayflower.

In response, Defendants advance numerous arguments, all of which the Court finds lacking. First, Defendants argue that Godfrey's phone numbers were never "listed" under Mayflower's name because the numbers appear only under Godfrey's name *in the White Pages*. In other words, Defendants attempt to distinguish between the White Pages, which they call "listings," and the Yellow Pages, which they call "advertising." Because the disputed numbers only appear under Mayflower's name in the Yellow Pages, Defendants argue that ¶ 17(f) is inapplicable.

Although we commend Counsel's creativity, we find that limiting ¶ 17(f) to numbers appearing in the White Pages would be nonsensical. What makes control of the numbers so important is that they appear in the Yellow Pages under the Mayflower name and logo, thus enabling lesser known local agents to associate themselves with Mayflower's nationally-recognized name, service marks and reputation. Since White Pages listings are not as important in this respect as Yellow Pages listings, we find it unlikely that the parties would have intended for ¶ 17(f) to apply only to White Pages listings. This is especially true where, as here, no other provisions in the agency agreement make a simi-

lar distinction between the various sections of the phone book. As a result, we find that for purposes of this motion, ¶ 17(f) makes no distinction between numbers appearing in the White Pages and those appearing in the Yellow Pages.

Defendants next argue that the Court should estop Mayflower from enforcing ¶ 17(f) because "Mayflower represented to Godfrey that Mayflower did not believe this type of provision [*i.e.* phone transfer provisions like ¶ 17(f) ] is enforceable" on two occasions when Godfrey was contemplating changing its affiliation to Mayflower from another interstate carrier. (Phoenix's Brief in Opposition, at p. 17). "Estoppel may occur when one party's conduct leads another to believe that a right will not be enforced and thus causes the one misled to act to his detriment." *Hammes v. Frank*, 579 N.E.2d 1348, 1358 (Ind.App.1991). The elements of estoppel under Indiana law are: (1) a representation or concealment of material facts; (2) the representation must be made with the knowledge of the facts; (3) the party to whom it is made must be ignorant of the matter; (4) it must be made with the intent that the other party should act on it; and (5) the other party must be induced to act upon it to his detriment. *Heredia v. Sandler*, 605 N.E.2d 1212, 1217 (Ind.App.1993); *Hammes*, 579 N.E.2d at 1358.

The problem with Defendants' promissory estoppel argument is that Defendants have failed to provide any evidence that Mayflower said ¶ 17(f) is unenforceable. At best the evidence produced at the hearing revealed only that Mayflower representatives opined that a phone number transfer provision *appearing in a competitor's agency agreement* was insignificant boilerplate. As a result, there simply is no "clear and unambiguous promise" by Mayflower to Godfrey that Mayflower would not seek to exercise *its* rights under ¶ 17(f). *Indiana Hi–Rail Corp. v. CSX Transportation, Inc.*, 818 F.Supp. 1254, 1262 (S.D.Ind.1993) (quoting *US West Financial Services, Inc. v. Tollman*, 786 F.Supp. 333, 334 (S.D.N.Y.1992)).[6]

6. Moreover, there is evidence to suggest that when Mayflower told Godfrey not to worry about

a similar provision appearing in a competitor's agency agreement, Mayflower was not saying

We find Defendants' waiver argument similarly unavailing. Waiver of a contract provision requires "the intentional relinquishment of a known right; an election by one to forego some advantage he might have insisted upon." *Lafayette Car Wash, Inc. v. Boes,* 258 Ind. 498, 282 N.E.2d 837, 839 (1972). That a Mayflower representative told Godfrey in 1981 and again in 1986 that a similar provision appearing in a competitor's agency agreement could not (or would not) be enforced falls considerably short of an intentional relinquishment by Mayflower of *its* rights under ¶ 17(f) in 1994.

Defendants next argue that ¶ 17(f) is both unconscionable and an unenforceable contract of adhesion. Under Indiana law, a contract may be declared unenforceable due to unconscionability when there is a gross disparity in bargaining power which leads the party with lesser power to sign the contract unwillingly or while unaware of its terms. The contract must be one that no sensible person—*i.e.* one who is not under delusion, duress or in distress—would make, and such as no honest and fair person would accept. *Justus v. Justus,* 581 N.E.2d 1265, 1272 (Ind.App.1991); *Stech v. Panel Mart, Inc.* 434 N.E.2d 97, 103 (Ind.App.1982). Similarly, an agreement is a nonbinding contract of adhesion "when a standardized form of agreement, usually drafted by the party having superior bargaining power is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms." *Rodenbeck v.*

*Marathon Petroleum Co.,* 742 F.Supp. 1448, 1455 (N.D.Ind.1990); *see also Weaver v. American Oil Co.,* 257 Ind. 458, 276 N.E.2d 144, 153 (1971) (Prentice, J., dissenting).

Significantly, not all standardized contracts are unenforceable. *Rodenbeck,* 742 F.Supp. at 1455. Nor does inequality in bargaining power alone render a contract unenforceable. *Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 339 (7th Cir. 1984). Indeed, "[c]ontract law would lose much of its meaning if unfavorable contract provisions could be challenged merely on the basis of the relative size of the contracting parties." *Pierson,* 742 F.2d at 339.[7]

In this case, the Court is not persuaded that ¶ 17(f) is unconscionable. Although we concede that the relative sizes of Mayflower and its local agents are unequal, that disparity in size does not necessarily translate into a gross disparity in bargaining power. To be sure, Thomas Lopinski, the owner of Godfrey who negotiated the agency agreement with Mayflower, is no neophyte in the moving and storage business. He started with Godfrey some time in the early 1960's and, by his own estimate, had nearly twenty-two years of experience when he negotiated the agreement in 1986. Moreover, the evidence introduced at the hearing revealed not only that Mayflower depends almost entirely on its local agents to solicit and arrange for its interstate transportation bookings, but also that "it is common practice in the moving industry for local agents to change interstate carrier affil-

---

that the provision was unenforceable, but that such provisions are often simply *unenforced*. Indeed, Gary Reynolds, Vice President Agency Development for Mayflower, testified that there are several variables affecting whether Mayflower, and presumably other interstate carriers, choose to exercise their rights under provisions like ¶ 17(f). For example, if an agency relationship is terminated only a few weeks before a new phone directory is scheduled to be released, Mayflower need only ensure that the new ads do not contain the Mayflower name and logo next to the ex-agent's phone numbers in order to protect its interests. Similarly, if the agency relationship ends because the local agent goes out of business, the local agency usually agrees to transfer the number to Mayflower without dispute, thus avoiding the need for any action pursuant to ¶ 17(f). Finally, if Mayflower does not have another agent in the area to handle the ex-agent's

business, then there is simply no gain in seeking the transfer of the numbers. Thus, although Mayflower often chooses not to enforce its rights under ¶ 17(f), that choice is still Mayflower's to make.

7. *See also* Restatement (Second) of Contracts § 208 cmt. d (1979) ("A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms").

iation," presumably to obtain better terms. (Phoenix's Brief in Opposition, at p. 15). Indeed, Godfrey itself has done so at least six times in the course of its existence, including two separate stints with Mayflower during the 1980's. Thus, we cannot say that Godfrey was wholly without bargaining power in this relationship.

Nor are the terms of ¶ 17(f) so unreasonable that no fair and honest person would accept them. When an agency relationship is established, Mayflower bestows on the agent the right to use the Mayflower name "and the design of a ship on waves, together with the color combination used by [Mayflower], in connection with its agency representation of [Mayflower] and to use same in its ... advertising, printed matter and general solicitation of such business." (Agency Agreement, ¶ 17(b)). As a result, a lesser known local agent is able to capitalize on Mayflower's national reputation as "the name you know." Once that relationship is terminated, however, Mayflower has legitimate interest in stopping the continued flow of these benefits to the ex-agent and/or to a competitor carrier. The bargain appears only slightly less reasonable from the perspective of the agent, who receives the right to use Mayflower's nationally-recognized name and service marks in Yellow Pages advertisements throughout the life of the agreement in exchange for a promise to transfer control of those numbers to Mayflower once the relationship ends. The Court also emphasizes the complete lack of evidence tending to show that Godfrey was coerced or otherwise unaware of ¶ 17(f) when it signed the agency agreement. Thus, Defendants have failed to establish either (1) that a great disparity in bargaining power that led "the party with lesser power to sign the contract unwillingly or while unaware of its terms," or (2) that the terms of the provision are so unreasonable that no sensible person would accept them.

Finally, Defendants maintain that the bankruptcy proceeding Godfrey initiated on November 29, 1994, precludes enforcement of ¶ 17(f) because the phone numbers are "property of the estate" under section 541 of the Bankruptcy Code. 11 U.S.C. § 541. However, the Bankruptcy Code does not create or enhance the property rights of a debtor:

> [W]hatever rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less. Section 541 is not intended to expand the debtor's rights against others more than they exist at the commencement of the case.

*Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1213 (7th Cir.1984) (internal marks omitted); *accord Matter of Jones,* 768 F.2d 923, 926–27 (7th Cir.1985). As the preceding discussion makes clear, Godfrey had no rights to the numbers after October 10, 1994, the date on which it terminated its agency agreement with Mayflower. Thus, because Godfrey's rights to the numbers expired under the contract, the subsequent filing of a bankruptcy petition cannot resuscitate those rights. *See also In re Thomas,* 883 F.2d 991, 995 (11th Cir.1989); *In re Gainesville P–H Properties, Inc.,* 77 B.R. 285, 295–96 (Bankr. M.D.Fla.1987); *In re Welborn,* 75 B.R. 243, 244 (Bankr.D.Mont.1987); *Robinson v. Chicago Housing Authority,* No. 94 C. 4781, 1995 WL 360706 (N.D.Ill. June 14, 1995).

In sum, the plain language of ¶ 17(f) gives Mayflower the right to control the use of phone numbers used by its local agents in conjunction with the Mayflower name and logo. Because Godfrey failed to transfer the numbers to Mayflower after Mayflower's request, the Court finds that Mayflower has shown a sufficient likelihood of succeeding on the merits of its breach of contract claim.

**(2). Mayflower Is Not Likely to Prevail on its Lanham Act Claim.**

For purposes of obtaining preliminary injunctive relief, Mayflower also asserts claims under Sections 32(1) and 43(a) of the Lanham Act. Those provisions provide in pertinent part:

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use

is likely to cause confusion, or to cause mistake or to deceive

\* \* \* \* \* \*

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (1988 & Supp.1994).

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(b) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (1988).

According to Mayflower, Phoenix's use of Godfrey's old phone numbers violates both section 32(1) and section 42(a) because "people consulting telephone directories and calling a company they believe to be a Mayflower agent instead reach Phoenix, which represents Red Ball, a competitor."

(Plaintiff's Brief in Support, at p. 10). To prevail on a claim under either provision, Mayflower must show that (1) it has a valid trademark and (2) the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of plaintiff. See Forum Corp. of North America v. Forum, Ltd., 903 F.2d 434, 439 (7th Cir.1990); Nike, Inc. v. "Just Did It" Enterprises, 6 F.3d 1225, 1227 (7th Cir.1993). The parties in this case do not contest that Mayflower's trademark is valid. Thus, the sole issue here is whether Phoenix's use of phone numbers appearing in Mayflower ads is likely to create the appearance that Phoenix is affiliated with Mayflower. See Nike, 6 F.3d at 1228–1229 (court should consider "whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product").[8]

The Seventh Circuit considers at least seven factors in evaluating the likelihood of confusion in trademark infringement cases, which are: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant "to palm-off his product as that of another." See Smith Fiberglass Products, Inc. v. Ameron, Inc., 7 F.3d 1327, 1329 (7th Cir.1993); AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 615 (7th Cir.1993). In applying these seven factors, the Seventh Circuit has noted that "none of the seven factors alone are dispositive, and the weight accorded to each factor will vary from case to case." Smith Fiberglass, 7 F.3d at 1329.[9]

Here, Plaintiffs identify several factors that would, in its opinion, cause confusion as

---

8. Ordinarily, trademark infringement cases are predicated on the theory that a defendant employed a trademark so similar to that of the plaintiff that the public will mistake the defendant's products for those of the plaintiff. Nevertheless, "it is well established that falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement." Burger King Corp. v. Mason, 710 F.2d 1480, 1492 (11th Cir.1983) (citations omitted) (internal quotation marks omitted).

9. See also AHP Subsidiary, 1 F.3d at 616 ("[T]he plaintiff need not prove each and every factor to prevail. However, the converse is also true; neither is it required that the defendant refute each and every factor. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of factors tilt the scale in favor of one side or the other.") (quoting Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1187 (7th Cir.1989)).

to Phoenix's affiliation with Mayflower. Mayflower notes, for example, that Phoenix offers a nearly identical service as does Mayflower and that the disputed numbers appear under Mayflower's actual service marks, thus increasing the likelihood that customers would confuse the two companies. Further, many of Godfrey's employees either hold or have held similar positions with Phoenix. Finally, Mayflower points to the testimony of Timothy Gendreau, a former customer of Godfrey's, who testified that he did not realize that Phoenix was unaffiliated with Mayflower despite his many dealings with Phoenix.

There can be no denying, however, the existence of several factors that lessen the likelihood that the public would confuse the two companies. For example, both Phoenix and its interstate carrier, Red Ball, have completely different names and service marks than Mayflower. Indeed, Phoenix's affiliation with Red Ball appears prominently on Phoenix's invoices, service order forms and trucks. That affiliation also appears in Phoenix's current advertising, in the Yellow Pages and otherwise, and on the large free-standing sign designating Phoenix's location. Moreover, testimony given at the hearing revealed that consumers often have three or four carriers submit estimates on the expected cost of a move. Thus, because customers are likely to use great care when selecting a van line, any initial confusion originating from the inaccurate Yellow Pages listing would be dispelled as the customer encountered actual representatives from individual van lines for purposes of finding the lowest bidder.

The evidence also suggests that Phoenix has made a good faith effort to alleviate confusion. Since October of 1994, Phoenix has engaged in an advertising campaign that unambiguously heralded its new relationship with Red Ball. *See Shakey's Inc. v. Covalt,*

704 F.2d 426, 432 (9th Cir.1983) (holding that defendant's advertising campaign help to alleviate confusion). Phoenix answers its phones as "Phoenix Moving Systems" or "Phoenix—Red Ball," thus putting callers on notice that Mayflower is not involved. Phoenix also has instituted its own phone protocol whereby callers who mention Mayflower are immediately given Mayflower's national "1–800" or Royal Oak, Michigan, number. Finally, Phoenix has obtained new numbers and is advertising these numbers in the new 1995 phone directories, and it is unreasonable to expect the old phone directory listings to be removed or changed before the new phone directories issue.[10] Thus, we find that for purposes of this motion Phoenix has taken sufficient affirmative steps to distinguish itself from Mayflower for purposes of complying with the Lanham Act.

In sum, although we are concerned that, despite his many dealings with Phoenix, Mr. Gendreau still had "no reason not to think [he] was still dealing with Mayflower" until the Spring of 1995, we note that Mr. Gendreau is the only customer, out of more than four hundred former Godfrey storage customers, identified by Mayflower as being confused by the relationship of Godfrey to Mayflower to Phoenix. (Transcript of Excerpt of Timothy Gendreau, at p. 2). Moreover, we surmise that his confusion derived not so much from any Yellow Pages ad, but from the chaos surrounding Godfrey's closing and the transfer of Mr. Gendreau's personal property to Phoenix for storage. We also emphasize that the "law of unfair competition does not impose upon [Phoenix] a duty to ensure that all customers are aware that they are no longer affiliated with [Mayflower], but merely a duty not to promote the perpetuation of the perception that they are." *Shakey's,* 704 F.2d at 432 (see cases cited therein); *see also Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985). Here, Phoenix has taken con-

---

**10.** *Cf. American Nursing Care of Toledo v. Leisure,* 609 F.Supp. 419, 432 (N.D.Ohio 1984) (court finds no trademark infringement because the "only place where plaintiffs' names continue to be listed as affiliated with defendant ... is in telephone books, which cannot change or be changed until the next edition, the first of which ... recently came out"); *Kampgrounds of Amer-*ica, Inc. v. North Delaware A–OK Campground, Inc.,* 415 F.Supp. 1288 (D.Del.1976) *aff'd* 556 F.2d 566 (3d Cir.1977) (court found no likelihood of confusion about defendant's affiliation with its ex-franchisor, even though numerous guidebooks and directories identified the defendant as still affiliated with the franchisor).

structive measures reasonably designed to alleviate any suggestion that Phoenix is somehow affiliated with Mayflower. Thus, the Court finds that Mayflower is unlikely to succeed on the merits of its Lanham Act claim.

### C. Irreparable Harm

█ In the preliminary injunction analysis of the Seventh Circuit, the requirements of irreparable harm and no adequate remedy at law tend to merge into one inquiry. *See Roth*, 57 F.3d at 1453; *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984). The issue is whether the movant will be made whole should it ultimately prevail on the merits and receive money damages.

█ Here, Mayflower asserts that Phoenix's use of the phone numbers is causing it to lose "customers and business every day." (Plaintiffs' Supplemental Brief in Support, at p. 16). We agree. Should Phoenix retain complete control over the numbers, Mayflower will lose sales and the opportunity to maintain and develop relationships with customers responding to its Yellow Pages ads. Indeed, given the importance of customer referrals in the moving business, the harm would be ongoing—that is, customers that Mayflower loses today will be unable to refer customers to Mayflower in the future. *See Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir.1994) (loss of present and future sales and customers constitutes irreparable harm); *Merrill Lynch, Pierce, Fenner & Smith v. Salvano*, 999 F.2d 211, 215 (7th Cir.1993) (evidence of possible loss of customers if injunction is not issued sufficiently supports district court's finding of irreparable harm and the inadequacy of the movant's legal remedy); *see also Gateway Eastern Railway Co. v. Terminal Railroad Assoc. of St. Louis*, 35 F.3d 1134, 1140 (7th Cir.1994)

(holding that loss of customers and resulting injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages). Thus, because such losses are difficult to quantify and a subsequent award of money damages would not make Mayflower whole, we find that Plaintiff has established that it is likely to suffer irreparable harm.[11]

### D. The Balance of Harms and the Public's Interest

█ Because Mayflower has satisfied its threshold burden of showing a likelihood of succeeding on the merits of its breach of contract claim and no adequate remedy at law, the Court must evaluate the relative harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently. This involves a "sliding scale" analysis that "seek[s] at all times to minimize the costs of being mistaken." *Storck USA*, 14 F.3d at 314 *quoting Abbott Laboratories*, 971 F.2d at 12. Thus, "the more likely it is that the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side." *Id.*

Here, Mayflower's potential harm from the wrongful denial of an injunction is significantly outweighed by the potential harm to Phoenix should an injunction be erroneously granted. Phoenix is a new business with gross receipts totaling only $285,000 for the first six months of 1995. Phoenix's president, Kari Ludka, testified that her company often struggles to meet its expenses and that the loss of the disputed numbers could cause Phoenix to permanently shut its doors. Mayflower, by contrast, received over $280 million in gross "line haul" business alone last year and, relatively speaking, is much more capable of absorbing the losses should an injunction not issue.

---

11. Furthermore, in trademark infringement cases, irreparable harm is generally presumed because damages to a company's reputation are considered irreparable harm. *See Abbott Laboratories*, 971 F.2d at 16; *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091–1092 (7th Cir.1988); *Health O Meter, Inc. v. Terraillon Corp.*, 873 F.Supp. 1160, 1175 (N.D.Ill.1995). Indeed, in *Processed Plastic Company v. Warner Communications*, 675 F.2d 852,

858 (7th Cir.1982), the Seventh Circuit noted that the "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods." Thus, to the extent that a customer remains confused about Phoenix's relationship with Mayflower, she may erroneously hold Mayflower accountable for an unpleasant experience with Phoenix.

Moreover, the evidence presented at the hearing suggests that Phoenix has staked much of its future success on its continued use of the numbers. Indeed, soon after it was incorporated in October of 1994, Phoenix began an aggressive marketing strategy which employed various types of leaflets and flyers, as well as a telemarketing campaign aimed at apartment leasing agents, companies contemplating moves and people who have recently placed their homes for sale. In all of these forms of advertising, Phoenix publicized the five phone numbers at issue here. Similarly, the disputed numbers appear on Phoenix's quotation forms, local storage estimate forms, letterhead, FAX cover pages and business cards. Thus, Phoenix undeniably has developed an identity and a clientele that are wholly unrelated to Mayflower's Yellow Pages ad.

Nor would the public interest be served by the outright transfer of the disputed numbers to Mayflower. At worst, an outright transfer could seriously weaken Phoenix's ability to compete in the marketplace, thus depriving the public from having as wide a possible selection of moving companies to choose from as possible. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir.1995) ("When deciding whether to grant or withhold equitable relief a court must give high regard to the interest of the general public, which is a great beneficiary from competition"). At best, an outright transfer of the disputed numbers would create the same problems of public confusion, loss of potential customers and the resulting loss of goodwill that has proved so worrisome to Mayflower throughout the course of these proceedings. Under that scenario, however, it would be Phoenix customers who would mistakenly reach Mayflower when dialing Phoenix's "old" number.

As a result, the Court favors a form of intermediate relief recently endorsed by the Seventh Circuit in *Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506 (7th Cir.1994). In that case, a phone-order company built its business by subscribing to the expired phone numbers of the plaintiff company and by allowing customers who called that number to believe they were dealing with the plaintiff. The district court granted the plaintiff's motion for a preliminary injunction, ordering the old numbers to be placed on a "split interrupt" service. Pursuant to that system, "when a caller calls the old number, an interrupt operator asks the caller whom the caller is trying to reach. If the caller identifies [the defendant], the operator provides a telephone number designated by [the defendant] for the caller to call. Similarly, if the caller identifies [the plaintiff] the operator provides a telephone number designated by [the plaintiff] for the caller to call." *Id.* at 508.

In affirming, the Seventh Circuit reasoned that "the public interest [was] well served by the" intermediate relief fashioned by the district court "because the public now will be able to decide which of the two it wishes to call." *Id.* at 510. Concluded the court:

> And therein lies the crux of this case. The district court's order allows buyers of [defendant's] products to make a decision—from whom to buy—with more information rather than less. The order makes certain that potential buyers of [defendant's] products know who it is they are calling. That is all it does.

*Id.; Cf. Abbott Laboratories*, 971 F.2d at 19 (district court committed error by not tailoring its injunctive relief to reflect less severe remedies that would leave defendant "a viable competitor" in the marketplace).

In this case, we too find that the use of an interrupt operator not only would balance the competing harms faced by Phoenix and Mayflower, who each has a legitimate entitlement to some of the potential customers calling in on the disputed lines, but also would serve the interests of the consuming public. Callers who want to speak to Phoenix can still do so. Callers seeking Mayflower will still find it. No longer will the parties and the Court entertain doubts as to who is entitled to the potential customers calling in on those lines because each individual customer can choose for herself. Thus, a split interrupt system "expands the realm of consumer knowledge, and as between ignorance and confusion on the one hand and knowledge and informed choice on the other, the latter prevails." *Duct–O–Wire*, 31 F.3d at 510.

### III. CONCLUSION AND ORDER.

For the reasons stated above, the Court GRANTS Mayflower's motion for a preliminary injunction. IT IS HEREBY ORDERED that telephone numbers (313) 769–4100, (313) 229–2280, (517) 322–2111, (313) 293–6300, (800) 388–4469, currently subscribed to in the name of Phoenix Moving Systems, be placed on "split interrupt" service, such that a caller will be asked to identify to an interrupt operator the party that the caller is attempting to reach. If the call identifies Phoenix Moving Systems or Phoenix—Red Ball (or a reasonable derivative thereof), then the telephone operator should provide a telephone number, designated by Phoenix Moving Systems, to the caller. If the caller identifies Mayflower (or a reasonable derivative thereof), then the telephone operator should provide a telephone number, designated by Mayflower, to the caller. Should there be any additional cost as a result of having these five numbers placed on split interrupt service, such cost shall be borne by Phoenix, in view of Mayflower's likelihood of prevailing on the merits of its breach of contract claim. Phoenix and Mayflower shall have until July 20th, 1995, to designate the forwarding telephone numbers of their choice, and the split interrupt feature should be instituted as soon as practical thereafter.

The parties are free to obtain alternative telephone service or features for such numbers should they mutually agree upon the same. This order will be in effect until such time as the 1995–96 Ann Arbor/Ypsilanti and South Lyon phone directories have been issued to the general public, or November 1, 1995, whichever comes first. Upon their issuance, the split interrupt service shall cease and control of all five numbers shall transfer entirely to Mayflower.

It is so ORDERED.